McCann L. **REID**, Plaintiff,

v.

**MEMPHIS PUBLISHING COMPANY,**
**Defendant.**

**Civ. No. 68–323.**

United States District Court,
W. D. Tennessee, W. D.

Dec. 17, 1973.

David E. Caywood, Louis R. Lucas, Ratner, Sugarmon & Lucas, Memphis, Tenn., for plaintiff.

Armistead F. Clay, Memphis, Tenn., for defendant.

## MEMORANDUM DECISION

ROBERT M. McRAE, Jr., District Judge.

This action was brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e. The plaintiff seeks damages based upon religious discrimination against him by the defendant newspaper publisher. The case is presently before the Court on remand from the United States Court of Appeals for the Sixth Circuit. Reid v. Memphis

Publishing Co., 468 F.2d 346 (C.A.6 1972). Following the remand, a supplementary evidentiary hearing was conducted by this Court in the light of the Court of Appeals opinion.

At the first hearing, the District Court, relying upon Dewey v. Reynolds Metals Company, (C.A.6 1970) 429 F.2d 324, affirmed by a divided court, 402 U. S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267, took the view that the burden of proof was upon the plaintiff to prove that he was not hired because of discrimination based upon religion. This Court found as a fact that there was an established policy on the part of the Memphis Press Scimitar that all of its employees be available to work on Saturday and took the further view that there was no duty on the part of an employer to accommodate an employee's or potential employee's belief contrary to the employer's established and required work schedule. This Court concluded that religious discrimination had not been established by the plaintiff's proof and, therefore, that the defendant had not been guilty of a violation of the Civil Rights Act of 1964 for a refusal to hire plaintiff because of discrimination based on religion.

The Court of Appeals distinguished the *Dewey* case, *supra*, from the instant case. In doing so, it noted that the E. E.O.C. regulation relied upon by the District Judge at the time of Dewey's discharge was not in effect but that at the time that the plaintiff in this case applied for employment the regulation was in effect. That regulation was adopted July 10, 1967, and it provides, in part, as follows:

"Part 1605—GUIDELINES ON DISCRIMINATION BECAUSE OF RELIGION

§ 1605.1 Observation of the Sabbath and other religious holidays.

\* \* \*

(b) The Commission believes that the duty not to discriminate on religious grounds, required by section 703(a)(1) of the Civil Rights Act of 1964, includes an obligation on the

part of the employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business. Such undue hardship, for example, may exist where the employee's needed work cannot be performed by another employee of substantially similar qualifications during the period of absence of the Sabbath observer.

(c) Because of the particularly sensitive nature of discharging or refusing to hire an employee or applicant on account of his religious beliefs, the employer has the burden of proving that an undue hardship renders the required accommodations to the religious needs of the employee unreasonable." 29 C.F.R. 1605.

The Court of Appeals held that the question on remand is not whether the defendant's rules, as established and applied by the Press-Scimitar, were intentionally discriminatory as to religion, but rather whether the Press Scimitar could make "reasonable accommodation" to the religious practices of plaintiff "without undue hardship". Reid v. Memphis Publishing Co., *supra*, 468 F. 2d at page 351. Plaintiff claims that the Press-Scimitar could have hired him as a copy reader to work Monday through Friday without undue hardship on the conduct of defendant's business. On the other hand, the defendant claims that to have hired the plaintiff as a copy reader to work Monday through Friday, not only regularly but also without ever being subject to work on Saturday, would have been an undue hardship on the conduct of defendant's business, and therefore defendant could not make a reasonable accommodation to plaintiff's religious practices.

Since this suit was filed plaintiff has gained other satisfactory employment and does not at this time seek to become employed by the defendant. The relief now sought is monetary damages only. The amount of damages sought is the difference between what plaintiff would have earned while working as a copy reader for the defendant and the pay he received until he took a position paying more than he would have earned as a copy reader for the defendant, and attorney's fees.

For clarity, the Court reiterates certain findings, namely, that the plaintiff was well qualified to become a copy reader for the defendant; that plaintiff was a member of the Seventh-Day Adventist Church; that one of the religious principles of the Seventh-Day Adventist Church is that its members should not work on Saturday; that plaintiff was offered the job as copy reader on the Press-Scimitar on the condition that he make himself available to work on any day, including Saturday.

The record further establishes that the Memphis Press-Scimitar, the one of the defendant's two newspapers on which there was an opening for a copy reader, publishes three editions Monday through Friday, two editions on Saturday and no editions on Sunday, and that the plaintiff declined to accept the position due to his sincere religious belief that he should not work on Saturday.

In accordance with the direction of the Court of Appeals Opinion, further evidence was offered on the employment practices of the Memphis Commercial Appeal, the other newspaper published by the defendant publishing company.

The proof shows that the Commercial Appeal had at the time in question two employees who were of the Seventh-Day Adventist faith and who were not required to work on Saturday. These employees were Lindley Richert and Glenn Allen. Richert was employed by the Commercial Appeal as a copy reader. The editor of the Commercial Appeal who employed Richert knew that Richert was a Seventh-Day Adventist and that he would not work on Saturday. However, since the Commercial Appeal publishes seven days per week, it has need of copy readers seven days a week. Sunday was a less preferable work day for many of the copy readers; there-

fore, the editor employed Richert and assigned him to Sunday work on a regular basis with Saturday as one of his regular days off.

In the case of Allen, he had been an employee of the Commercial Appeal before he became a Seventh-Day Adventist. He worked in the Commercial Appeal's library, which is staffed seven days a week. Allen customarily worked on Sunday and continued to work on Sunday after he became a Seventh-Day Adventist.

No changes in work schedules were required to be made by the Commercial Appeal, in order to accommodate Saturdays off for either Richert or Allen. On the contrary, their ready willingness to work on Sundays was well-suited to the Commercial Appeal's seven-days-per-week publishing requirement and was actually an accommodation to the newspaper.

At the supplemental evidentiary hearing the defendant offered further testimony pertaining to the duties of copy readers at the Memphis Press-Scimitar in an effort to meet the burden of proof cast upon it by the E.E.O.C. regulation determined to be applicable by the Court of Appeals, namely, that the accommodation of granting the plaintiff Saturday off would create an undue hardship on the newspaper.

The proof establishes that a newspaper copy desk is a kind of reduction or selection department for news. Much more news comes to the paper through the wire services and through local sources than can be printed in the paper. The news that comes in includes world news, national news and local news. It is the duty of the News Editor to receive and review the news; edit it; determine what will be printed; check for punctuation; check for accuracy of fact; write head lines and sub-heads; make selection of news items or stories based upon various factors such as the nature of the news, the edition concerned, length of the story or item, and

the like. The copy readers assist the News Editor in this task.

Copy readers sit at a horseshoe shaped desk. The News Editor, or person performing his function, sits at the middle of the desk and is called the slot man. The copy readers sit around the rim of the desk. As news comes in to the slot man he passes it to one of the copy readers for appropriate action.

Copy readers usually develop special abilities in addition to their general abilities, and normal operations require a crew of copy readers who possess expertise or experience in specific areas. Some of those specific areas or specialties at the Press-Scimitar are: the ability to perform as slot man; to handle telegraph, i. e. news arriving by wire; to handle Mid-South news; to handle society copy; to handle the magazine section, special features, makeup and markets.

The Press-Scimitar's normal complement of copy readers is ten, including the News Editor who mans the slot position when on duty.

The scheduling of the copy readers is done on a weekly basis by the News Editor subject to the approval of the Managing Editor. The scheduling is difficult for various reasons. First, the specialty requirement must be considered. While some copy readers possess more than one specialty, in addition to their general ability, none possess all of the specialties; and while some by additional training might acquire additional special skills, experience has demonstrated that certain ones are more adapted by nature, and others less adapted by nature, to become proficient in special skills. Because of this need for special skills, all copy readers are not interchangeable with all other copy readers.

The processing of the three editions published daily by the Press-Scimitar, Monday through Friday, requires copy reader services during a period of time which may vary somewhat on different

days but ranges from 5 o'clock A.M. to as late as 4:30 P.M. This range of time usually requires two different persons to man the slot position on days other than Saturday. The Saturday period ranges from 5:00 A.M. to about 1:30 P.M.

The length of a normal work day for a copy reader is eight hours. The copy desk work must be so scheduled as to have adequate manpower with proper specialties present during the entire copy desk operation period. Each copy reader gets an annual vacation of two, three or four weeks, depending upon his length of service. Timewise, about forty-six weeks of time go into vacations and holidays for the copy readers. Sickness takes about another eight weeks. With a normal complement of ten copy readers, including the News Editor, overtime work is required of copy readers from time to time in order to meet the manpower requirements on the copy desk.

Trial Exhibits 4 and 5 of the June 1973 hearing are copies of weekly schedules for the copy readers. Trial Exhibit 4 is a May 1973 schedule and Trial Exhibit 5 is a collective exhibit of five weekly schedules in November and December 1967. These exhibits and testimony of the News Editor, Luther Southworth, show some of the problems of scheduling. However, they also reflect that there are regular variations from the desired normal situation and so called minimum standards. They also show that some copy readers are pulled off the copy desk for other editorial assignments, and on some occasions reporters are used as copy readers.

At the time plaintiff was being considered for the copy reader position, the Editor of the Press-Scimitar was planning to transfer George Lapides, one of the copy readers, to another position, and he planned to put plaintiff, if employed, into the position to be vacated by Lapides. It was customary for Lapides to work on Saturday.

The proof shows that the News Editor intended to observe plaintiff's performance during a period of his adjustment to the job of copy reader at this particular paper in the light of all the duties to be performed by the available personnel. This is a process which would apply on the hiring of any new copy reader. Because the plaintiff was not hired, there is no way to determine how long it would have taken to discover what jobs the plaintiff was best suited for. However, the record clearly establishes that the plaintiff had sufficient skill and experience to successfully become one of the ten copy readers on the Press-Scimitar staff.

Proof was offered by the defendant that an alternative to manpower shortage would be to require overtime work from the available staff, at time and one-half pay, or to employ an extra copy reader. However, the proof in this regard was not specific and the amount of the additional economic burden incident to such overtime or employment of extra personnel was not shown.

The defendant contends and offered opinion testimony from the executive personnel that if plaintiff had been employed by the defendant with all Saturdays guaranteed off, a serious morale problem would have been encountered. The proof shows two copy reader employees, Pinegar and Parker, who customarily work on Saturday, had requested to be scheduled so as to have Saturday off, but these were not for religious reasons. Their requests were refused. The proof shows that all copy readers, with the exception of the News Editor himself, are required to work from time to time on Saturday, in order to meet the manpower requirements which sometimes become critical due to factors of vacation, sickness and the fact that all copy readers are not interchangeable. However, the proof also shows that Saturday work is infrequent for some copy readers and there is a not too clearly defined rank hierarchy based upon the

length of service and other factors. Presumably, the lower morale would result from resentment of the copy readers with more seniority who preferred to be off on Saturday for non-religious reasons, if the management sought to accommodate the plaintiff's religious practices. There is also opinion testimony offered by the plaintiff from a former employee of the Press-Scimitar editorial department to the effect that plaintiff would overcome this resentment.

The above noted proof addresses itself primarily to the "undue hardship" test which was offered alternatively in the event that the Court does not adopt a finding which supports the defendant's persistent position, namely, that granting a member of the editorial department of the Memphis Press-Scimitar a regular day off for religious purposes is contrary to the policy of the newspaper which is applied equally to all personnel.[1]

■ By taking this position the defendant effectively contends that the plaintiff's request to be relieved from Saturday work would be beyond the scope of a "reasonable accommodation" of his religious practices. This Court concludes that the request of the plaintiff to be relieved of Saturday work upon the basis of religious beliefs is within the scope of the "reasonable accommodation" test imposed by Congress and those authorized to promulgate E. E.O.C. regulation 1605.

· Furthermore, it should be noted that one of the distinctions made by the Court of Appeals between the *Dewey* case and the instant case was that the employer had offered an accommodation to Dewey prior to his being discharged. Reid v. Memphis Publishing Co., *supra*, at page 349. In the instant case the defendant is unwilling to offer to anyone an accommodation in the form of being allowed to be off work on any day for religious purposes.

Having determined that a request for Saturday off for religious reasons is a reasonable accommodation, it is incumbent upon this Court to apply the facts of the case to the "undue hardship" test referred to in the E.E.O.C. regulation and the Court of Appeals remand.

The regulation specifies an example in § 1605.1(b) wherein it provides:

"Such undue hardship for example, may exist where the employee's needed work cannot be performed by another employee of substantially similar qualifications during the period of absence of the Sabbath observer."

■ This would indicate that an employer would be expected to assign other employees voluntarily or involuntarily to perform the work of the Sabbath observer, provided the accommodation meets the test of reasonableness and does not create an undue hardship otherwise.

■ In the instant case clearly there were other copy readers of substantially similar qualifications to perform the work to be done by the plaintiff during his observance of the Sabbath. Upon consideration of the proof pertaining to specific hardships, such as the scheduling of copy readers of particular experience, the possible effect of morale of other employees, and the possible economic burden caused by additional overtime, the Court concludes that the defendant has not proven that an undue hardship would have rendered the required accommodation to the religious needs of the plaintiff unreasonable, particularly, in view of the fact that the defendant personnel did not make any attempt to accommodate the religious needs of the plaintiff.

---

1. While there is no proof that any person who observes the Sabbath on Sunday has indicated unwillingness to do so on religious grounds, the customs and practices of the community and the newspaper permit the employees of the Memphis Press-Scimitar to be off on Sunday except in unusual circumstances. .

While it is true that the plaintiff's lack of experience on this newspaper's staff and the then existing problems of scheduling would cause additional burdens, which might be considered a hardship for management personnel, the test is *undue* hardship, which this Court does not believe to be established by the proof.

This Court has previously found that there was no intentional discrimination on the part of defendant personnel due to plaintiff's religion. Similarly, there is no proof that the executives of the defendant were aware of the obligations imposed upon them by the regulation at the time of the refusal to hire. However, the opinion of the Court of Appeals in this case applied Griggs v. Duke Power Company, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) and quoted therefrom with regard to the principle that the Civil Rights Act of 1964 proscribes not only overt discrimination, but also practices that are fair in form, but discriminatory in operation. 468 F.2d at page 350. ". . . Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation." Griggs v. Duke Power Co., *supra*, at page 432, 91 S.Ct. at page 854.

It must be remembered that Congress by the Civil Rights Act of 1964 recognized and established new statutory rights of employees in the areas of race, religion and sex. This imposed obligations on employers and, to some extent, employees to change some long standing policies and practices.

The Court having concluded that defendant has not met the test imposed by the law and regulations, the question of damages must now be considered.

Title VII of the Civil Rights Act of 1964 authorized a monetary award intended to restore to recipient his rightful economic status absent the effects of the unlawful discrimination. This award is not punitive. It is equitable in its nature. Robinson v. Lorillard Corp., 444 F.2d 791, 802 (C.A.4 1971).

In the instant case the plaintiff was not hired as of October 1, 1967. At the time he was employed as the editor of a much smaller newspaper, The Tri-State Defender, at a salary of $100.00 per week. On June 30, 1970, the plaintiff terminated his employment with that newspaper and obtained other type employment at a salary which was in excess of what he would be making at the Memphis Press-Scimitar at that time and all times since June 30, 1970.

The proof on damages reflects various factors which affect the amount. Trial exhibits 6 and 7 of the June 1973 hearing are copies of successive collective bargaining agreements which were in effect during the damage period. These set forth minimum weekly salaries of copy readers based upon length of service with the paper. The agreements also provide for automatic increases at various times during the life of the agreement.

The agreements also provide that pay in excess of the minimum may be established by individual negotiations between the management and the employee. The plaintiff positively testified that the editor of the Press-Scimitar told him that he would start at a salary of $125.00 per week and in ninety days the salary would be increased to $150.00. These amounts were above the then applicable minimums set forth in the contract. The editor testified that he recalled that he considered the plaintiff's prior experience to entitle him to more than the minimum, but he did not recall saying that the plaintiff's salary would be increased to $150.00 per week in ninety days.

Based upon the proof the Court finds that the equitable monetary award to the plaintiff should be computed as follows:

| TIME PERIOD | TRI-STATE DEFENDER | PRESS-SCIMITAR |
|---|---|---|
| Oct. through Dec. 1967 (13 weeks) | $100.00/wk.—$1300.00 | $125.00/wk.—$1625.00 |
| Jan. 1, 1968 thru July 6, 1968 (27 weeks) | $100.00/wk.—$2700.00 | $150.00/wk.—$4050.00 |
| July 7, 1968 thru Aug. 1, 1969 (55 weeks) | $105.00/wk.—$5757.00 | $155.00/wk.—$8525.00 |
| Aug. 1, 1969 thru June 30, 1970 (43 weeks) | $112.00/wk.—$4816.00 | $180.00/wk.—$7740.00 |
| TOTAL | $14,591.00 | $21,940.00 |
| DIFFERENCE | $ 7,349.00 | |

Plaintiff also contends that he should receive an additional award in an amount that the defendant would have paid into the company retirement fund. This Court does not agree with that contention, and therefore denies that sum as part of the plaintiff's award for economic loss.

The only remaining issue concerns the allowance and award of attorney's fees to the plaintiff from the defendant.

In a Title VII case the Court has the statutory discretion to allow the prevailing party a reasonable attorney's fee as part of the costs. 42 U.S.C. § 2000e–5(k).

This provision of the law has been construed to mean that attorney's fees should be imposed for two purposes, one to punish defendants for pursuing frivolous arguments, and two in order to encourage individuals to vindicate the strongly expressed congressional policy against discrimination proscribed by the Act. However, in the application of the latter purpose the strong factors are whether the plaintiff has filed a class action and has been awarded injunctive relief. Robinson v. Lorillard Corp., *supra*, at page 804. See also Clark v. American Marine Corp., 320 F.Supp. 709 (E.D.La.1970), affd. 437 F.2d 959 (C.A. 5 1971).

In the light of all the circumstances shown by the proof in the instant case this Court concludes that its discretion should be exercised by not awarding the plaintiff attorney's fees.

For the reasons set forth above the Clerk is directed to enter a judgment in favor of the plaintiff in the amount of $7,349.00.