**Larry G. HARDISON, Plaintiff,**

v.

**TRANS WORLD AIRLINES et al.,**
**Defendants.**

**No. 20096-1.**

United States District Court,
W. D. Missouri, W. D.

May 15, 1974.

William H. Pickett, Kansas City, Mo., for plaintiff.

James J. Mollenkamp, Michael D. Gordon, Jolley, Walsh, Gordon & Staab, Kansas City, Mo., for defendants.

## MEMORANDUM AND ORDER

JOHN W. OLIVER, District Judge.

This is an action by an individual plaintiff against his former employer, Trans World Airlines (TWA) and three labor organizations, International Association of Machinists and Aero Space Workers (The International), International Association of Machinists and Aero Space Workers, District 142 (District 142), and International Association of Machinists and Aero Space Workers, Local 1650 (Local 1650) seeking redress from alleged religious discrimination in violation of the Civil Rights Act of 1964. Plaintiff asserts that his discharge from employment because of his refusal to work from sundown Friday to sundown Saturday pursuant to the tenets of his religion was a violation of his religious liberty, contrary to 42 United States Code, § 2000e–2. Plaintiff is a member of the Worldwide Church of God.

The jurisdiction of this Court is based upon 42 United States Code, § 2000e–5 (f). Defendant TWA is an employer engaged in interstate commerce and subject to Title VII of the Civil Rights Act of 1964, 42 United States Code, § 2000e et seq. Defendant unions are labor organizations likewise subject to the provisions of Title VII.

### I.

Defendants first argue that this Court does not have jurisdiction in this case because of the alleged failure of the plaintiff to comply with the filing deadline of 42 U.S.C. § 2000e–5(d). That argument is answered by the decision of our controlling court in Richard v. McDonnell Douglas Corporation, 469 F.2d 1249 (8th Cir. 1972), which held that the 210-day statute of limitations is tolled upon receipt of the complainant's

complaint by the E.E.O.C. Accordingly, in this case plaintiff's complaint of August 29, 1969, tolled the 210-day statute of limitations so that even if we assume that the E.E.O.C. assumed jurisdiction of plaintiff's case on November 18, 1969, the latest arguable date, plaintiff perfected his federal remedy well within the proper time. We find and conclude, therefore, that we do have jurisdiction of this case under the provisions of 42 U.S.C. § 2000e–5(d).

The defendant International challenges this Court's jurisdiction over it on the ground that there was no proper service of process on that organization. The alleged service was made by serving a copy of the complaint on James Tarwater, the financial secretary of Local 1650, who had no official capacity with the International.

■ We find and conclude that Local 1650 and The International are not autonomous and that, therefore, service upon the local constitutes valid service ·of process on The International. See Deboles v. Trans World Airlines, Inc., 350 F.Supp. 1274 (E.D.Pa.1972) and Claycraft Co. v. United Mine Workers of America, 204 F.2d 600 (6th Cir. 1953).

■ We further find and conclude that because Local 1650, District 142, and The International are not autonomous, the interests of the latter two organizations were adequately represented before the E.E.O.C. by Local 1650. The argument, therefore, of defendants, District 142 and The International, that they could not be sued in federal court because they were not named in the complaint before the E.E.O.C. is without merit. See Moody v. Albemarle Paper Co., 271 F.Supp. 27 (E.D.N.C.1967).

■ Defendants argue also that plaintiff failed to exhaust his administrative remedies, first, because he did not pursue administrative remedies set out in the Railway Labor Act (45 U.S.C. § 151 et seq.) and, second, because he did not otherwise pursue contract grievance procedures. The first argument is answered by Norman v. Missouri Pacific Railroad, 414 F.2d 73 (8th Cir. 1969), which reversed the district court's dismissal of a complaint filed pursuant to Title VII of the Civil Rights Act of 1964. The Court of Appeals held that the complaint was cognizable under the Civil Rights Act absent specific prohibitions in the Railway Labor Act and that the Railway Labor Act did not foreclose efforts of employees to secure their statutory rights under the Civil Rights Act. No specific prohibition in the Railway Labor Act has been cited by defendants.

■ The second argument is answered by the recent decision of the Supreme Court in Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L. Ed.2d 147 (February 19, 1974), which held that an employee is not foreclosed from suing in federal court under Title VII of the Civil Rights Act of 1964 after arbitration proceedings resulted in an unfavorable ruling. The Court concluded that no election of remedies principles inhered in Title VII. Submission of a claim to one forum does not preclude a later submission to another, Justice Powell declared in the majority opinion. It follows, therefore, that plaintiff can choose to proceed under Title VII without resorting to grievance procedures at all.

## II.

The relevant factual circumstances of this case are not substantially disputed. Many of the facts stipulated by the parties in Standard Pretrial Order No. 2 are simply not relevant. Other findings suggested by the parties in which there is dispute are for the most part irrelevant. The facts as we have found them include only those relevant to the resolution of the legal questions presented and for the most part are those which admit of very little dispute. The following discussion will serve as our findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure.

## A. *Union Responsibility*

Plaintiff names the three union defendants in his complaint and asks for an injunction against the unions to prevent them from failing to adequately represent the plaintiff and from depriving plaintiff of his right to freely exercise his religious beliefs without discrimination by the Union. In his suggested conclusions of law, plaintiff states merely that defendant unions "discriminated against plaintiff by reason of his religion in violation of the Civil Rights Act of 1964 by enforcing a collective bargaining agreement which was discriminatory against plaintiff in its application." Plaintiff cites a number of cases in support of this proposition without discussion. We have studied all of those cases. Most are entirely irrelevant to the issue of whether the union should be held responsible for the violation, if any, of the Civil Rights Act of 1964. Other are relevant only by broad application of the principles stated therein.

Labor union compliance with the Civil Rights Act of 1964 is dictated by 42 U. S.C. § 2000e–2(c):

It shall be an unlawful employment practice for a labor organization—

(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

(2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

Although it is nowhere stated directly by plaintiff, it appears that he is complaining that the union discriminated against him because of its failure to refuse to comply with the seniority provisions of the collective bargaining agreement between TWA and The International, which governed plaintiff's employment. A violation of those provisions would have been required in order to adjust his schedule with one of the other workers on his shift so that he would be able to observe his Sabbath.

Plaintiff, in arguing that the Unions discriminated against him by "enforcing a collective bargaining agreement which was discriminatory against plaintiff in its application," is arguing that the Union acted wrongly by standing by the contract and refusing actively to support plaintiff's efforts to avoid the seniority provisions of the contract. This actually amounts to an assertion that the Union has a rather stringent duty to accommodate.

The duty to accommodate, which we shall discuss in more detail later in this opinion, at the time the alleged discrimination in this case took place, was required by E.E.O.C. guideline 29 C.F.R. § 1605.1:

(b) The Commission believes that the duty not to discriminate on religious grounds, required by Section 703(a)(1) of the Civil Rights Act of 1964, includes an obligation *on the part of the employer* to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business. [Emphasis supplied]

The Unions interpret this language to mean that the duty is imposed only on the employer. They argue that that limitation was intentional because, they contend, a union has no power to accommodate. The Union only has pow-

er to control its own organization, make collective bargaining agreements with the employer, and enforce those agreements. The employer, the Unions conclude, is the only one who is in a position to accommodate.

We disagree. The language of the regulation does speak in terms of the employer but so have other provisions and regulations pursuant to the Act, which have been interpreted to include the union. For example, 42 U.S.C. § 2000e–2(h), the provision on seniority systems discussed below has been applied to unions. See, e. g., Local 189, United Papermakers and Paperworkers v. United States, 416 F.2d 980 (5th Cir. 1969).

Furthermore, this case is a perfect example of a situation in which a union could accommodate a member if required to do so. TWA agreed that plaintiff could change shifts if the union approved. Such approval would mean that the union would have to suspend the operation of the seniority rules in plaintiff's case. Had the union made this accommodation, plaintiff would have been able to observe his Sabbath as he wished. The question, however, is whether Title VII imposed upon the unions the duty to ignore their contract under the circumstances of this particular case.

We do not believe that Title VII goes that far. We find and conclude that to require the union to ignore seniority in every case in which an employee with lesser seniority can observe his Sabbath only by changing shifts with a more senior employee would work an undue hardship on the union.

In an article written after Dewey v. Reynolds Metals Co., 429 F.2d 324 (6th Cir. 1970), Professor Harry T. Edwards and Mr. Joel H. Kaplan expressed concern that the E.E.O.C. regulation imposing the duty to accommodate places an intolerable burden on the employer. They described the burden of proving undue hardship as "nearly impossible to demonstrate if the work force is large enough." Edwards and Kaplan, Religious Discrimination and the Role of Arbitration Under Title VII, 69 Mich.L.Rev. 599, 628 (1971). They rightly argue that such an interpretation "imposes a priority of the religious over the secular" in that it might require an employer to favor employees whose religious beliefs require them to follow different schedules than the regular over other employees, even to the point of violating the other employees' bargained for rights. The same considerations apply in the case of the unions.

The labor-management contract to which the union is a party clearly sets out the seniority rules which are binding on the company and the union (Article VI(b), Pl.Ex. 30). That contract, of course, can not operate in violation of the laws of the United States but we do not believe that Title VII requires that the seniority provisions be ignored. Professor Edwards and Mr. Kaplan discuss this problem at length:

Assume that an employer operates a seven-day-a-week operation, that he has entered into a collective bargaining contract with the union, and that the contract provides for shift preference by seniority. What if a low-seniority employee, who works a shift that includes Saturday and Sunday, converts to a religion that requires him not to work on one of those days? Must the employer then transfer this employee out of a Sunday or Saturday shift even though numerous employees with greater seniority are required to work over the weekend? Under the E.E. O.C. guidelines, the transfer of one employee could hardly be said to create an "undue hardship" for the employer, but what of the other employees? What of the hardship imposed on the employee who waited a long time to acquire sufficient seniority in order to avoid weekend work and is now forced back into it because of someone else's religious beliefs? Are the religious beliefs of one individual so weighty that they supersede the lack of religious beliefs of another? [69 Mich.L.Rev. at 628].

■ Professor Edwards and Mr. Kaplan argue that the E.E.O.C. guidelines are confusing and could be construed to require the employer in every case to shift an employee out of seniority to accommodate religious beliefs. We do not believe that the E.E.O.C. guidelines require such a result. The hardship on employees should certainly be considered as hardship on the conduct of business, for the management of employees is one of the chief concerns of a large business and, in the case of a labor union, is the chief concern. A hypertechnical application of the words "undue hardship of the employer's business" by ignoring this fact, would, as Professor Edwards and Mr. Kaplan argue, impose "a priority of the religious over the secular" [69 Mich.L.Rev. at 628] and would perhaps raise constitutional questions.[1] See Dewey v. Reynolds Metals Co., 429 F.2d 324, 334–335 (6th Cir. 1970). We find and conclude, therefore, that it would have been an undue hardship for the unions to have changed plaintiff's shift in violation of the seniority provisions of the labor management contract.

Finally, with reference to the seniority provisions, we find and conclude that 42 U.S.C. § 2000e–2(h), if not absolutely controlling, at least indicates that Congress did not intend that unions or employers be required to take actions that could impinge upon bona fide seniority systems. That Section reads as follows:

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system . . . pro-

vided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin. [42 U.S.C. § 2000e–2(h)].

A significant judicial gloss has been placed on this language by courts processing racial discrimination cases. Consequently, a seniority system can not be "bona fide" if it perpetuates the consequences of past discrimination. In other words, a seniority system is not lawful if it freezes Negroes into past patterns of discrimination. See Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir. 1971), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); Local 189, United Papermakers and Paperworkers, AFL–CIO, CLC v. United States, 416 F.2d 980 (5th Cir. 1969); and Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va.1968).

■ Plaintiff does not urge, nor, do we think, may he urge, that the seniority system in this case locked in any discrimination against individuals of plaintiff's or anyone else's religion. The seniority system was not designed with the intention to discriminate against religion nor did it act to lock members of any religion into a pattern wherein their freedom to exercise their religion was limited. It was coincidental that in plaintiff's case the seniority system acted to compound his problems in exercising his religion. He did not have sufficient seniority in the building to which he transferred to be able to impose his choice of days off over those of the other employees who had more seniority.

■ The duty to accommodate under the circumstances of this case, therefore, did not require the union to ignore its seniority system. It did, however, require that the union fairly repre-

1. Professor Edwards and Mr. Kaplan direct attention to Judge Learned Hand's decision in Otten v. Baltimore & Ohio R.R., 205 F.2d 58, 61 (2d Cir. 1953), in which he stated:
The First Amendment protects one against action by the government . . . but it gives no one the right to insist that in the pursuit of their own interests others must conform their conduct to his own

religious necessities. . . . We must accommodate our idiosyncrasies, religious as well as secular, to the compromises necessary in communal life; and we can hope for no reward for the sacrifices this may require beyond our satisfaction from within, or our expectations of a better world.

sent the plaintiff when it became aware of the fact that plaintiff was facing difficulty in scheduling for his Sabbath and that he was in danger of disciplinary action by the company. See Macklin v. Spector Freight Systems, Inc., 478 F.2d 979, 988 (D.C.Cir. 1973), and United States v. Bethlehem Steel Corp., 312 F.Supp. 977, 988 (W.D.N.Y.1970), rev. on other grounds, 446 F.2d 652 (2nd Cir. 1971). A union always has an affirmative duty to protect its members from unlawful discrimination in its area of authority, i. e., negotiating a nondiscriminatory contract, Robinson v. Lorillard Co., *supra*; or processing grievances of discrimination, United States v. Bethlehem Steel Corp., *supra*.

In this case, since the collective bargaining agreement was essentially nondiscriminatory, it can only be argued by plaintiff that the unions failed to properly process his grievance. We do not believe that the facts sustain such a charge.

The union first learned about plaintiff's problem at a meeting that Hardison had with Everett Kussmann, Manager, Stores Systems, on September 6, 1968, and at which James Tinder, Local 1650 steward, was present. At that meeting, plaintiff's requirements for time off on religious holidays were discussed and Kussmann agreed that the steward should seek to swap days off, to excuse time off on specific religious holidays if plaintiff agreed to work on regular holidays, and to attempt to find plaintiff another job (Pl.Ex. 16). There was no evidence that Tinder took any active part in that meeting. After the meeting plaintiff, on October 9, 1968, wrote Kussmann stating his satisfaction in the arrangements discussed and advising Kussmann that he had transferred to the 11 to 7 shift, which did allow him to observe his Sabbath (Pl.Ex. 2).

On December 2, 1968, plaintiff voluntarily transferred from Building 1, where he had sufficient seniority to bid on a shift which would allow him to observe his Sabbath, to Building 2, where he was second from the bottom in seniority.

Kussmann arranged for a meeting to be held on March 6, 1969 to discuss ways to avoid any difficulty that might arise because of plaintiff's new schedule. The Local 1650 steward, Mr. Tinder, was present at that meeting. Apparently several possibilities for meeting plaintiff's requirements were proposed: (1) changing plaintiff's shift; (2) changing plaintiff's job; and (3) allowing plaintiff to work four days a week. Tinder was amenable to working out plaintiff's problem on any of the above bases, subject, however, to the seniority provisions of the contract. On that date there were no jobs open for bid nor did plaintiff have sufficient seniority to bid on any other job (Tr. 168). The seniority provisions, therefore, precluded the possibility of plaintiff's changing his shift. (Tr. 82–85, 154–155, 157–169, 193, 225–227). They also prevented plaintiff from changing his job (Tr. 167–168). The company was unwilling to permit plaintiff to work only four days a week (Tr. 270).

Plaintiff, therefore, was not satisfied with the results of this meeting. He did not, however, file a grievance with the grievance committee as he knew he had a right to do. (Tr. 169).

Plaintiff was absent from work on March 8, March 15, and March 22, 1969. On March 21, plaintiff met with A. J. Butcher, Supervisor, Stores Planning and Control, and James Tinder. As a result of that meeting Butcher wrote plaintiff on the same day advising him that a discharge hearing would have to be scheduled (Pl.Ex. 6).

Before the discharge hearing, the grievance committee met with plaintiff for approximately an hour and discussed the possible approaches to resolving the problem. Finally, the grievance committee decided that the best approach would be for plaintiff to remain on the job, pleading for leniency at the discharge hearing, and if that hearing resulted in discharge, to attempt to obtain a reversal of that decision at a higher level

(Tr. 385). The possibility of the union waiving its seniority provisions so that plaintiff could get on a different shift was apparently not discussed. (Tr. 389–391). Plaintiff told the committee to use its own judgment in presenting the grievance (Tr. 387).

After the meeting, but before the discharge hearing, plaintiff changed his shift to the twilight shift, which permitted him to have Saturdays off. The testimony was that the union believed at this time that its problems were solved (Tr. 391). But on March 28, 1969, plaintiff quit work at sundown and it became immediately apparent that the union would not be able to argue that plaintiff should not be dismissed because his conflicts had been resolved (Tr. 391–392).

Immediately prior to the discharge hearing on March 31, 1969, the union held another meeting with plaintiff and reviewed the various approaches to the problem and the procedures for appealing to District 142 if the company decided to discharge plaintiff (Tr. 392–393). Plaintiff was told that he should sit next to Earl Box, Chairman of the Grievance Committee, so he could object to any errors made by the Committee.

At the hearing, the union argued against discharge on the grounds that procedural errors had been made and that discharge was too severe a penalty for the infractions with which plaintiff was charged (Joint Stip. 31).

Immediately after the discharge hearing Box again explained the appeals procedure to plaintiff (Tr. 397). On April 12, 1969, a letter was sent to plaintiff explaining that he had been found guilty of insubordination and was, therefore, discharged. Several days later plaintiff again met with the Grievance Committee and asked about the possibilities of his resigning to keep his record clean. He was told that the company would probably not accept his resignation and was again told of appeal procedures and that the Local would forward the case to the District (Tr. 398).

Joseph Whitney Bowers, General Chairman of District 142, attempted several times but was unable to contact plaintiff (Tr. 446, 452). He finally arranged two different meetings with plaintiff, through plaintiff's father-in-law, Cyrus See (Tr. 444, 457). Plaintiff failed to make either one of them and Bowers, pursuant to standard procedures, dropped the case (Tr. 405–406).

■ In light of our findings of fact with regard to the union's actions in processing plaintiff's case, we find and conclude that the unions did not violate their duty to plaintiff under Title VII of the Civil Rights Act of 1964.

■ The duty of fair representation requires that the union act in good faith and without malice. See Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). We do not find that Local 1650's representation of the plaintiff in his dispute with TWA was arbitrary, discriminatory, or in bad faith. Any failure on the part of District 142 to pursue the matter after discharge was due entirely to plaintiff's lack of cooperation, which made it impossible to proceed with an appeal. The problem never reached The International. We find and conclude, therefore, that judgment should be entered in favor of the three union defendants.

### B. *TWA Responsibility*

Defendant TWA makes several arguments against plaintiff's contention that it violated Title VII of the Civil Rights Act of 1964 when it discharged him:

[1] A statutory requirement to accommodate religious needs of employees would violate the Establishment Clause of the First Amendment.

[2] Title VII of the Civil Rights Act of 1964 does not require employers to affirmatively accommodate employees' religious needs.

[3] TWA made reasonable accommodations to plaintiff's religious beliefs up to the point where fur-

ther steps would have caused undue hardship.

[4] Plaintiff voluntarily placed himself in a position which he knew or should have known would diminish his chances for Sabbath observance.

[5] TWA did not "intentionally" discriminate against plaintiff on account of his religious beliefs. [Def. TWA Brief, pp. 35–36].

The first question that must be resolved is indicated by # 2 above and that is what kind of duty to avoid religious discrimination did Title VII of the Civil Rights Act of 1964 impose upon TWA. At the time of the acts complained of, 42 U.S.C. § 2000e–2(a)(1) provided, in part, as follows:

(a) It shall be an unlawful employment practice for an employer:

(1) To fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; . . .

The statute did not provide for any duty on the part of an employer to accommodate the religious needs of employees.

The E.E.O.C. regulation which set out the guidelines on religious discrimination, however, provided as follows:

(b) The Commission believes that the duty not to discriminate on religious grounds, required by Section 703(a)(1) of the Civil Rights Act of 1964, includes an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business . . . . [29 C.F.R. § 1605.1(b)].

The question, therefore, becomes whether the E.E.O.C. regulation is a proper interpretation of the Act before it was amended to specifically include a duty to accommodate. TWA cites Dewey v. Reynolds Metals Co., 429 F.2d 324 (6th Cir. 1970), aff'd per curiam by an equally divided court, 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971), in support of its position that the Act did not impose a duty to accommodate. In Dewey, an employee alleged he had been wrongfully discharged from his employment because of his religious beliefs. The Court of Appeals held that the trial court had erred in applying the regulation, which was not in effect until July 10, 1967, to the activity of the employee, which took place in 1966. The Court, in Riley v. Bendix Corp., 464 F.2d 1113, 1117 (5th Cir. 1972) expressed the view that Dewey offers no guidance on the question of whether the regulation was a valid one because it was not in effect when the acts complained of took place. We agree.

We note further, however, that in Dewey the employer offered the plaintiff, as well as all other employees, the option of either working on Sunday or finding a replacement. The plaintiff did find replacements for five Sundays and then refused to find others, claiming that this practice was a sin. The Court of Appeals held that even if the 1967 regulation were applied, the employer made a reasonable accommodation by offering the replacement system.

Finally, Dewey was based in large part on the final award of a grievance arbitrator under the labor management contract, which has nothing to do with the question at issue here.

In Riley v. Bendix Corp., supra, the Court held flatly that the regulation was valid. It relied in part upon the amendment of the Act, which was approved by the Congress on March 8, 1972. Far from holding that that amendment indicates that the legislative intent of the old Act was not to include a duty to accommodate, as TWA argues we should

conclude, the Court in *Riley* held the amendment validated and recognized the regulation as a proper interpretation of the old Act.

The amendment to 42 U.S.C. § 2000e (j) is as follows:

The term "religion" includes all aspects of religious observance and practice, as well as belief unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

The union's brief refers us to Eighth Circuit cases which state broad principles of statutory interpretation to the effect that amendments to statutes passed for the purpose of correcting a judicial interpretation should be applied prospectively only when Congress intended to change the former law as interpreted by the courts. That principle is obviously correct but defendants ignore the legislative history of the amendment at issue in this case.

The legislative history, reported at 118 Congressional Record, §§ 227–253, includes this statement by Senator Randolph of West Virginia, who sponsored the amendment:

I think in the Civil Rights Act we thus intended to protect the same rights in private employment as the Constitution protects in Federal, State or local governments. Unfortunately, the courts have, in a sense, come down on both sides of the issue. The Supreme Court of the United States, in a case involving the observance of the Sabbath and job discrimination, divided evenly on this question.

This amendment is intended, in good purpose, to resolve by legislation —and in a way I think was originally intended by the Civil Rights Act— that which the courts apparently have not resolved. [118 Congressional Record at § 228]

The measure was passed in the Senate by unanimous vote.

The Chairman of the House Committee made this statement about the amendment:

The purpose of this subsection is to provide the statutory basis for EEOC to formulate guidelines on discrimination because of religion such as those challenged in Dewey v. Reynolds Metals Company, 429 F.2d 325 [324] (6th Cir. 1970). Affirmed by an equally divided court, 402 U.S. 689 [91 S.Ct. 2186, 29 L.Ed.2d 267] (1971). [118 Congressional Record, pp. 1861–1862]

The measure was also passed in the House by unanimous vote.

 We find and conclude that the legislative history of the amendment of the Act, together with the fact that weight should be given to the administrative interpretation of the Act, as reflected by the regulation (see Griggs v. Duke Power Co., 401 U.S. 424, 433, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)) indicate that regulation 29 C.F.R. § 1605.-1(b) was facially valid and is controlling in this case.

 We find TWA's argument that the duty to accommodate an employee's religious beliefs is a violation of the Establishment Clause of the First Amendment to be without merit. Defendant TWA correctly states the test for determination of whether a governmental action violates the Establishment Clause as it was set out in Committee for Public Education and Religious Liberty v. Nyquist et al., 413 U.S. 756, 772–773, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973); (1) that the law must reflect a clearly secular legislative purpose; (2) that the law must have a primary effect that neither advances nor inhibits religion; and (3) that the law must avoid excessive government entanglement with religion. Defendant, however, has not given the Court much guidance as to how the accommodation regulation runs afoul of this test other than arguing that the regulation "clearly places the sanction of law behind religion by facilitating and encouraging employees to take time off from their jobs for religious

observances so that employees with religious beliefs are aided as against nonbelievers." [Def. TWA Br. pp. 24–25]

It has been well established, however, that not every law that confers an incidental benefit on a religious institution or a person of a particular religion is, for that reason alone, constitutionally invalid. See, e. g., Walz v. Tax Commissioner, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), which held that a state could, consistent with the Establishment Clause, choose not to tax church property. Cf. Luetkemeyer v. Kaufmann, 364 F.Supp. 376 (W.D.Mo. 1973).

The duty to accommodate, as stated in 42 U.S.C. § 2000e(j), reflects the general secular legislative purpose of guaranteeing an employee that he will not be discharged from his job merely because of his religion. Consistent therewith, the regulation also imposed a duty to accommodate. The incidental effect of the regulation perhaps indirectly aids religion but its primary effect is to guarantee job security. The purpose and effect of the law as interpreted by the regulation is not primarily to aid religion but to prevent employers from devising means to discriminate which are not facially discriminatory but which do discriminate in effect and intent.

Finally, the regulation does not involve excessive government entanglement with religion. The regulation simply requires the employer to make affirmative efforts to accommodate the employee's religion. No further involvement is necessary than a judgment by the E.E.O.C. or the court that no such accommodation was made. That is not the kind of entanglement contemplated in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), and Tilton v. Richardson, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971).

We find and conclude, therefore, that the interpretation of Title VII's prohibition of discrimination by reason of religion, as embodied in the E.E.O.C. regulation, 29 C.F.R. § 1605.1(b) does not violate the Establishment Clause of the First Amendment to the Constitution of the United States.

We must now determine whether TWA did in fact take steps to make an accommodation to plaintiff's religious needs. The interpretation of the statute embodied in the regulation requires that the employer show that it was unable to reasonably accommodate the employee's religious observance without undue hardship on the conduct of the employer's business. See, e. g., Riley v. Bendix Corporation, 464 F.2d 1113, 1118 (5th Cir. 1972).

TWA argues that it made three efforts to reasonably accommodate plaintiff's beliefs, that these were not successful from plaintiff's point of view, and that it was unable to make any further efforts. In April, 1968, plaintiff wrote Everett Kussmann, Manager of Stores Systems, asking for Friday sunset to Saturday sunset off (Pl.Ex. 1). In response to that request Kussmann (1) agreed to the union steward seeking to swap or days off; (2) to excuse time off on religious holidays if plaintiff agreed to work on "Christian" holidays if requested; and (3) to attempt to find plaintiff another job. (Pl.Ex. 16). On May 7, 1968, the steward reported that he was unable to work out scheduling changes and that he understood that no one was willing to swap days with plaintiff (Pl.Ex. 17). TWA did not take part in the search for employees willing to swap shifts (Tr. 348) and it was admitted at trial that the Union made no real effort (Tr. 346–350). Plaintiff, however, was able for a period of time to work out his day off requirements within the framework of the seniority system (Tr. 214).

On October 4, 1968, plaintiff wrote a letter to Kussmann, informing him that he had worked out his days off requirement by transfer to the 11–7 shift and renewing his request for specific religious holidays off (Pl.Ex. 2). In response, Kussmann reiterated his offer to permit time off on plaintiff's religious holidays whenever possible and request-

ed a list of those holidays (Pl.Ex. 3). On October 20, 1968, plaintiff supplied such a list and expressed his gratitude for Kussmann's "understanding and co-operation." (Pl.Ex. 4).

On December 2, 1968 plaintiff transferred from Building 1, where he had sufficient seniority to maintain a shift in which he could observe his Sabbath, to Building 2, where he was near the bottom of the seniority list and could not be assured a satisfactory shift. His reason for the change was that he was married at that time and a change to Building 2 permitted him to work the day shift and have his evenings free (Tr. 39). On March 7, 1969, a man of less seniority than plaintiff went on vacation and plaintiff was required to work in his position, which required him to work on Saturday (Tr. 39).

Kussmann anticipated difficulties due to the events described above and so arranged a meeting on March 6 with plaintiff and the union steward, James Tinder (Tr. 131). At that meeting Kussmann offered to accommodate plaintiff's religious observance by agreeing to any trade of shifts or change of sections that plaintiff and the union could work out (Tr. 131–132). Any shift or change was impossible within the seniority framework and the union was not willing to violate the seniority provisions set out in the contract to make a shift or change.

TWA claims that any further action on its part would have caused undue hardship to the conduct of its business. First, had TWA forced another employee to trade shifts or jobs with plaintiff, such action would have violated the seniority provisions of the labor management contract and TWA would have been subjected to personnel problems and grievances (Tr. 157, 193).

Had TWA simply granted plaintiff days off on Saturday it would have left TWA short of help in that position. Plaintiff worked in the Stores Department of TWA's facilities at Kansas City International Airport (KCI). That de-partment is responsible for housing, retaining, and making available parts for use by TWA at its overhaul base at KCI and throughout its system. It operates on a twenty-four hour, seven-day-a-week basis. On weekends TWA worked a minimum number of employees and plaintiff was the only person in his job on his shift during the weekends. To leave that position empty would have impaired the supplying of parts for essential airline operations (Tr. 220, 221, 264, 265, 286, 360, 361). To fill plaintiff's position with someone from another area would deprive that area of its regular manpower (Tr. 221, 262, 293, 294, 362). To bring in a man not working on that day would force TWA to pay premium wages for the time he filled in for plaintiff (Tr. 221, 263, 294).

TWA argues also that if all employees were treated uniformly as to their religious beliefs and observances, it could be very difficult to perform seven-day-a-week airline operations.

We find and conclude that TWA's actions with respect to working out plaintiff's religious observance was a reasonable accommodation by TWA and that any further action by TWA would have worked an undue hardship on the conduct of its business. The duty to accommodate does not require that an employer make every effort short of going out of business to permit his employees to say on the job and also to observe their religion. The term *"reasonable* accommodation" (emphasis added) should be read with the term "undue hardship" to arrive at the proper standard.

The duty imposed on an employer by Title VII is not a duty to impose hardships on the rest of his employees or members to accommodate the religious beliefs of a few. It is simply a duty to take affirmative action to try to find a way to permit the employee to observe his religion as he wishes, as opposed to a duty simply not to intentionally discriminate. A study of very few cases that have decided the question of

whether an employer has made a reasonable accommodation does not contradict that construction.

In Jackson v. Veri-Fresh Poultry, Inc., 304 F.Supp. 1276 (E.D.La.1969), plaintiff, a Seventh Day Adventist, was discharged from her position as a chicken picker when she advised the company that she would be unable to work between 5:00 p. m. Friday and 5:00 p. m. Saturday because of the requirements of her religion. There was no evidence that the company made any effort to accommodate her or that it would suffer undue hardship if it did not permit her the time off she requested. The company simply advised her that if she would not work company hours, she would be discharged. The Court found for plaintiff and ordered that she receive back pay.

In Riley v. Bendix Corp., 464 F.2d 1113 (5th Cir. 1972), the Circuit Court of Appeals for the Fifth Circuit reversed the decision by the district court, reported at 330 F.Supp. 583 (M.D.Fla. 1971), that plaintiff was not entitled to relief because there was no intentional discrimination on the part of the company. The Court of Appeals held that the E.E.O.C. regulation was a valid interpretation of the Act and that, therefore, the company had the burden of proving that it had attempted to make reasonable accommodations. The Court found no evidence on the record that the employer was unable to reasonably accommodate Riley's religious observance or practice without undue hardship on the employer's business.

In Reid v. Memphis Publishing Co., 468 F.2d 346 (6th Cir. 1972), the Court of Appeals for the Sixth Circuit reversed the decision by the district court that an employer had no duty to accommodate an employee's religious belief. The Court remanded the case with instructions that the trial court consider evidence on the issue of whether the employer could reasonably accommodate plaintiff's religion without undue hardship.

On remand the district court in Reid v. Memphis Publishing Co., 369 F.Supp. 684 (W.D.Tenn.1973) found that the employer had not offered any accommodation to the plaintiff and that no undue hardship would result in permitting the plaintiff, a Seventh Day Adventist, and a copyreader for the defendant, to have Saturday off. Specifically, the court found that the newspaper had other copyreaders who could take plaintiff's place, that the newspaper's evidence concerning scheduling difficulties, morale problems, and financial burden was not sufficient to show undue hardship. The evidence on undue hardship, the court stated, was not specific and not of the requisite strength to sustain the employer's burden of proof.

In Claybaugh v. Pacific Northwest Bell Telephone Co., 355 F.Supp. 1 (D. Or.1973), the plaintiff was discharged from his job at one of Bell's operations that had a round-the-clock, seven-days-a-week schedule after he joined the Seventh Day Adventist Church and refused to work on his Sabbath, Saturday. The evidence showed that the employer would encounter difficulties in permanently changing plaintiff's schedule to meet his demands. The court found, however, that the employer had made absolutely no affirmative effort to accommodate plaintiff's religious observance. The company did not try to temporarily accommodate plaintiff, which it was clearly able to do, while attempting to find a permanent solution. It did not look for a possible trade with another employee nor an open position into which plaintiff could move to avoid the conflict with his religious beliefs. The court concluded that Bell had not made a reasonable accommodation.

In none of the cases cited did the employer show that it had taken affirmative action on behalf of the employee. In this case, and in sharp contrast, TWA established as a matter of fact that it did take appropriate action to accommodate as required by Title VII. It held several meetings with plaintiff in

which it attempted to find a solution to plaintiff's problems. It did accommodate plaintiff's observance of his special religious holidays. It authorized the union steward to search for someone who would swap shifts, which apparently was normal procedure (Tr. 349). Witnesses for TWA testified that they attempted to work out plaintiff's problems in ways that had proved successful in similar cases (Tr. 305).

TWA would not have been placed in a position where it could not work out plaintiff's problem had plaintiff, to suit his own convenience, not transferred to Building 2 where he had insufficient seniority to bid on a suitable shift. That factor, however, should be viewed as a frustration of TWA's attempts to accommodate, and not as an action which relieved TWA of the duty to accommodate, as TWA argues.

We find and conclude that further accommodation by TWA would have worked an undue hardship on the conduct of its business. TWA had two choices for further accommodation: (1) to simply allow plaintiff to take his time off and attempt to replace him; or (2) to force another employee to change shifts.

TWA runs a twenty-four-hour-a-day, seven-days-a-week operation. Plaintiff performed an important job for TWA and was the only person performing his particular job on his shift during the weekend. To replace him with an employee from another area would leave that employee's work crew short. To replace him with an employee who was not regularly scheduled to work at that time would have caused TWA to pay premium wages. Both of these solutions would have created an undue burden on the conduct of TWA's business. Title VII cannot be interpreted to require that

companies finance employee's religious beliefs.

TWA is a party to a labor-management contract which clearly sets out a seniority provision which is binding on the company and on the union. (Article VI(b), Pl.Ex. 30). With respect to any asserted duty on the part of TWA to change plaintiff's shift in violation of the seniority provisions of the labor-management contract, the same considerations apply here as applied with respect to the union. Title VII does not force TWA to impose upon other employees because of one employee's religious belief. TWA's business includes the administration of its many employees and to impose hardships upon them imposes hardships upon the company's business. We find and conclude, therefore, that it would have been an undue hardship for TWA to have changed plaintiff's shift in violation of the seniority provision of the labor-management contract.

Finally, we again make reference to the seniority provisions of Title VII, 42 U.S.C. § 2000e–2(h), which exempts different treatment to different employees based upon a bona fide seniority system from the other provisions of § 2000e–2. That section, as we stated in reference to the union's duty to accommodate, indicates that Congress did not intend that unions or employers be required to take actions that would impinge upon bona fide seniority systems.

For the reasons stated, we find and conclude that neither TWA nor any of the three unions violated Title VII of the Civil Rights Act of 1964 by reason of its discharge of plaintiff for his refusal to work on his Sabbath. Accordingly, it is

Ordered that the Clerk of the Court enter judgment for defendants.