Larry G. HARDISON, Appellant,

v.

TRANS WORLD AIRLINES, INC., et al., Appellees.

No. 74–1424.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 10, 1974.

Decided Dec. 16, 1975.

William H. Pickett, Kansas City, Mo., for appellant.

Michael D. Gordon, Kansas City, Mo., for appellees, Unions.

George E. Feldmiller and James J. Mollenkamp, Kansas City, Mo., for appellee, TWA.

Dennis Rapps, Brooklyn, N. Y., and Nathan Lewin, Washington, D. C., for amicus curiae National Jewish Commission on Law and Public Affairs.

William A. Carey and Joseph T. Eddins, Associate Gen. Counsel, Beatrice

Rosenberg, Charles L. Reischel and Washington Marshall, Attys., E.E.O.C., Washington, D. C., for amicus curiae.

Before LAY, BRIGHT and WEBSTER, Circuit Judges.

WEBSTER, Circuit Judge.

This appeal presents for our review important questions concerning the requirements of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and the guidelines on religious discrimination promulgated thereunder, 29 C.F.R. § 1605 (1974). Larry G. Hardison, a member of the Worldwide Church of God, initiated this employment discrimination case against his union and his employer following his discharge as a Trans World Airlines (TWA) stores clerk for alleged insubordination. The factual background of this litigation is not disputed, and, in summarizing the relevant details, we rely heavily upon the findings of the District Court,[1] reported in *Hardison v. Trans World Airlines,* 375 F.Supp. 877 (W.D.Mo.1974).

Hardison's job was covered by a collective bargaining agreement negotiated with TWA by the International Association of Machinists and Aero Space Workers, the International Association of Machinists and Aero Space Workers, District 142, and the International Association of Machinists and Aero Space Workers, Local 1650, all defendants below.[2] That agreement contained seniority provisions relating, *inter alia,* to days off and vacations.

The Stores Department at the Kansas City International Airport, in which Hardison had worked from June 5, 1967, until his discharge on April 2, 1969, operates twenty-four hours per day, seven days per week. Hardison initially worked as a stores clerk in Building No. 1, performing work which was essential to TWA's operation but not unique. In

---

1. The Honorable John W. Oliver, United States District Court for the Western District of Missouri.

2. While distinctions between the local, district, and international unions are made by appel-

lees in this appeal, our holding makes it unnecessary to take account of such distinctions, and the unions are sometimes for convenience collectively referred to herein as "the union".

the spring of 1968, Hardison began studying the teachings of the Worldwide Church of God. That religion requires its members to refrain from all work on certain designated holidays as well as on its Sabbath, which occurs each week from sundown on Friday to sundown on Saturday. Hardison discussed his religious studies with Everett Kussman, the Manager of the Stores System, who notified a TWA supervisor by memo as follows:

1. Agreed to Steward seeking swap of days off

2. Agreed to odd holidays (excused T.O.) *if* he works the 'Christian' holidays when requested.

3. He advises you are getting him another job—agreed *you should*. Belongs to the 'World Wide Christian Church' Garner Ted Armstrong Ambassador College Pasadena Calif.

Soon thereafter, the supervisor notified Kussman that he had been unable to make any "headway" in trying to resolve the problem. Hardison continued to work on Friday evenings and Saturdays, including some voluntary overtime work. On October 4, 1968, Hardison wrote Kussman that he had transferred to the 11:00 p. m. to 7:00 a. m. shift as a result of which he would be able to observe the Sabbath and would soon formally enter the Worldwide Church of God. He reminded Kussman of his assurance that Hardison would be excused from work on certain holidays under those circumstances. Subsequently, he furnished Kussman at his request a list of religious holidays and dates thereof.

On December 2, 1968, Hardison bid for a position as a stores clerk in another section in Building No. 2 in order to obtain a day shift position. Hardison indicated that his reason for transferring to the Building No. 2 section was his recent marriage: he felt day work would be more compatible with married life. Each of these stores clerk sections was governed by a separate seniority list.

Thus, although Hardison had relatively high seniority in Building No. 1, he had the second lowest seniority position in Building No. 2. As a result, his ability to select days off was considerably diminished.

In March, 1969, Bill Wyatt, the man on the bottom of the seniority list in the Building No. 2 section, went on vacation. Hardison was called to substitute for Wyatt, whose work schedule included Friday evenings and Saturdays. On March 6, 1969, Hardison met with Kussman and James Tinder, a union steward, to discuss the conflict between this schedule and Hardison's religious practices. Several possible adjustments were explored,[3] but since all required Hardison to do some work on the first Saturday, March 8, none of these adjustments were instituted. Hardison did not file a grievance concerning this unsatisfactory resolution although he knew he had a right to do so.

Hardison did not report for work on Saturday, March 8, informing the storekeeper that he had personal business to do. Hardison was likewise absent from work on the following two Saturdays, March 15 and March 22. He was then notified that a discharge hearing had been scheduled. Prior to that hearing, Hardison met with Local 1650's grievance committee. Various avenues of legal redress and defenses were discussed, and it was decided that the best approach would be a plea for leniency coupled with an effort to obtain reversal at a higher level in the event of an adverse result. The possibility that the union might waive its seniority rules to permit Hardison to work on a different shift was not discussed. Following the meeting, Hardison voluntarily changed his shift to the "twilight shift" (3:00 p. m. to 11:00 p. m.) in an effort to resolve the problem. When Hardison left work early (at sundown) on Friday, March 28, however, it became apparent that this change in schedule would not obviate future problems as Local 1650 had hoped.

---

**3.** These included such possibilities as changing Hardison's shift, changing his job, or permitting him to work four days per week rather than five.

The discharge hearing was held on March 31, 1969, before TWA representative J. H. Frey. Although Local 1650 argued that termination was too severe a penalty, Hardison was found guilty of insubordination and discharged on April 2, 1969. Thereafter, both Local 1650 and District 142 attempted to contact Hardison about pursuing the matter further, but upon receiving no cooperation from Hardison, they dropped the case.

Hardison filed an unlawful employment practice charge with the Equal Employment Opportunity Commission which deferred to the Missouri Commission on Human Rights. On February 10, 1972, after all administrative procedures had been exhausted, Hardison filed suit against TWA and the three unions in United States District Court pursuant to 42 U.S.C. § 2000e–2.[4] He contended that all the defendants had practiced religious discrimination and, in addition, that the unions had violated their duty of fair representation. Following a trial to the court on primarily stipulated facts, judgment was entered for all defendants on the ground that each had attempted a reasonable accommodation of plaintiff's religious needs, as required by the controlling statutes and guidelines, and that undue hardships would have resulted from any greater efforts. *Hardison v. Trans World Airlines, supra.*

In essence, the decision below held that the valid seniority provisions of the unions' collective bargaining agreement with TWA did not permit further accommodation by any of the defendants. Hardison appeals, contending that the District Court's findings of reasonable accommodation and potential undue hardship were clearly erroneous. Separate briefs have been filed by Hardison, the unions, TWA, and by two amici curiae seeking reversal, the Equal Employment Opportunity Commission and COLPA (National Jewish Commission on Law and Public Affairs).

The issues before us include the alleged unconstitutionality of Title VII and the guidelines on religious discrimination, the extent of the unions' duty of fair representation under the circumstances presented, and whether the findings below that the defendants had fulfilled their respective duties to attempt a reasonable accommodation, short of undue hardship, of Hardison's religious practices were clearly erroneous.

I

STATUTORY AND REGULATORY FRAMEWORK

Our review must necessarily begin with an examination of the controlling statutes and regulations.

The Civil Rights Act of 1964 specifically forbids employers from practicing religious discrimination in specifically enumerated ways.

42 U.S.C. § 2000e–2(a) provides in part:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; * * *

42 U.S.C. § 2000e–2(c) provides:

It shall be an unlawful employment practice for a labor organization—

(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

(2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of em-

---

4. Federal jurisdiction was established below under 42 U.S.C. § 2000e–5 and is not challenged on appeal.

ployment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

The EEOC is empowered to promulgate regulations in aid of the statute. 42 U.S.C. § 2000e–12(a). The original guidelines provided:

> However, the Commission believes that an employer is free under Title VII to establish a normal work week (including paid holidays) generally applicable to all employees, notwithstanding that this schedule may not operate with uniformity in its effect upon the religious observances of his employees. For example, an employer who is closed for business on Sunday does not discriminate merely because he requires that all his employees be available for work on Saturday.

29 C.F.R. § 1605.1(a)(3), 31 Fed.Reg. 8370 (1966). The regulations were modified in 1967 to provide:

> The Commission believes that the duty not to discriminate on religious grounds, required by section 703(a)(1) of the Civil Rights Act of 1964, includes an obligation on the part of the employer to make reasonable accommodations to the religious needs of employees and prospective employees where such accommodations can be made without undue hardship on the conduct of the employer's business. Such undue hardship, for example, may exist where the employee's needed work cannot be performed by another employee of substantially similar qualifications during the period of absence of the Sabbath observer.

29 C.F.R. § 1605.1(b), 32 Fed.Reg. 10298 (1967). · The EEOC further placed upon the employer "the burden of proving that an undue hardship renders the required accommodations to the religious needs of the employee unreasonable." 29 C.F.R. § 1605.1(c), 32 Fed.Reg. 10298 (1967).

The possibility that the revised regulations might impose a burden (to accommodate) not contemplated by the statute which posed "grave constitutional questions" of violation of the Establishment Clause of the First Amendment was raised in dicta in *Dewey v. Reynolds Metals Co.,* 429 F.2d 324, 334 (6th Cir. 1970), affirmed by an equally divided Court, 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971). *Dewey* also concluded that Title VII only prohibited acts taken with intent to discriminate. This conclusion was rejected by the Supreme Court in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

In 1972, Congress incorporated the substance of 29 C.F.R. § 1605.1(b) into the Act by defining "religion" as follows:

> The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j).

■ This amendment has been held to have eliminated all doubt that the guideline at 29 C.F.R. § 1605.1 reflects the will of Congress. *Reid v. Memphis Publishing Co.,* 468 F.2d 346, 351 (6th Cir. 1972);[5] *Riley v. Bendix Corp.,* 464 F.2d 1113, 1116–17 (5th Cir. 1972). The District Court likewise so held, and we agree.

*Reid v. Memphis Publishing Co.,* 521 F.2d 512 (6th Cir. 1975). We are more persuaded by the earlier opinion and by Judge Edward's dissent.

---

**5.** In a second appeal, a different panel of the Sixth Circuit (Edwards, J., dissenting) seems to have receded from its prior holding that the regulation was consistent with the statute.

## II

## TWA LIABILITY

■ 29 C.F.R. § 1605.1, which we hold to be consistent with the statute, defines the parameters of the employer's duty. The company may not accept the role of a Pontius Pilate.[6] An effort to accommodate the employee's religious observances must be made. Such accommodation need only be a reasonable one. An accommodation alternative which imposes undue hardship upon the employer's business is unreasonable and not required. The burden of demonstrating its inability to reasonably accommodate falls upon the employer.

The record reflects a consistent effort by Hardison to acquaint TWA with his religious conversion and the effect of that commitment upon his ability to work during his Sabbath period and certain other religious holidays. He made no demands which were not consistent with his known religious beliefs. He was willing to work long weeks or short weeks provided his religious obligation to abstain from work on his Sabbath could be met. He even transferred to the twilight shift in order to minimize the impact of his absence on the company.

■ We cannot agree with the company's contention, apparently accepted by the District Court, 375 F.Supp. at 891, that Hardison's transfer from Building No. 1 to Building No. 2 was evidence of a lack of cooperation on his part. The implication is that if Hardison had not transferred he would have retained enough seniority in Building No. 1 to protect himself against Sabbath day assignments. This is not accommodation. To limit Hardison's right of transfer within the company as a condition of accommodation would be "to discriminate against [him] with respect to his * * * conditions, or privileges of employment, because of [his] * * * religion * * *." 42 U.S.C. § 2000e–

2(a)(1). The purpose of this transfer was to obtain a daytime shift, Hardison having recently married. While the regulation implies that the employee must be responsive to a reasonable accommodation, no such accommodation was ever offered by TWA, which at all times contended that it was precluded from accommodating Hardison's Sabbath observance by the collective bargaining agreement. Before an employer can assert the defense of non-cooperation, it is incumbent upon it to establish the accommodation which it has tendered and with which the employee refused to cooperate. *See Riley v. Bendix Corp., supra; Claybaugh v. Pacific Northwest Bell Telephone Co.,* 355 F.Supp. 1, 4–6 (D.Or.1973) (Employer should have attempted a temporary accommodation in view of its large work force).

Hardison's job assignment in Building No. 2 was to pick up or deliver parts needed by mechanics working in the building. He was to "run the train", that is, to continually make the rounds of the shops in the building. He was part of a work force of 38 to 40 people, although he would be the only person running the train during his particular shift on the weekend. TWA conceded that there were over 200 available employees who were capable of performing Hardison's work.

■ The District Court concluded that TWA had made a reasonable effort to accommodate Hardison's religious beliefs and that the alternatives rejected by TWA would have created an undue burden on TWA's business. Upon a full review of the record, we must respectfully disagree with both conclusions.

### Alternatives Rejected

(1) Within the framework of the collective bargaining TWA could have permitted Hardison to work a four-day week. Hardison was willing to do this,[7] but the company would not agree be-

---

6. Matthew 27:24.

7. Hardison was also willing to work a six-day week but this solution was in apparent violation of the 40 hour per week clause of the contract.

cause it would be short-handed during one shift. It conceded that a supervisor could be utilized or another worker on duty elsewhere could be transferred, but urged that this would cause some other shop function to suffer. Similar arguments have been rejected by the Equal Employment Opportunity Commission. E.E.O.C. Decision No. 70–580 (March 2, 1970), 2 FEP Cases 516, 1973 CCH EEOC Decisions ¶ 6120; E.E.O.C. Decision No. 70–110 (Aug. 27, 1969), 2 FEP Cases 225, 1973 CCH EEOC Decisions ¶ 6062.

■ In determining whether a possible accommodation would result in undue hardship or mere inconvenience, we must look to the facts of each case. The burden of demonstrating undue hardship is upon the employer. In this case, the company contends that a short week for one man during the temporary period of Wyatt's vacation would have hampered its operations. Two company witnesses expressed such an opinion without any further evidence or factual support. We think the District Court erroneously drew an inference of undue hardship from such testimony. The actual hours involved in this case did not even amount to a full shift, since Hardison had transferred to the twilight shift and would have worked from 3:00 p. m. on Friday until sundown (approximately 6:30 p. m.), thus further reducing the impact upon the company's operations. Balanced against the interests to be protected by § 2000e, we cannot say such an accommodation would result in an undue hardship to the employer.[8]

■ (2) Another alternative within the framework of the collective bargain-ing agreement was for TWA to fill Hardison's Sabbath shift from other available personnel. This could be accomplished by holding a worker over from the last shift, calling a worker in early, or, more logically, assigning a worker from the pool of 200 employees qualified to do the work. TWA contended that this alternative would be an undue hardship because such workers must be paid overtime compensation. The District Court said, "The duty to accommodate does not require that an employer make every effort short of going out of business to permit his employees to s[t]ay on the job and also to observe their religion", 375 F.Supp. at 889, and that "Title VII cannot be interpreted to require that companies finance employee's religious beliefs." 375 F.Supp. at 891. These general statements, while arguably correct, may tend to distort the actual hardship which overtime payments would have imposed upon TWA to fill Hardison's Sabbath shift under the facts of this case. The regulation does not preclude some cost to the employer anymore than it precludes some degree of inconvenience to effect a reasonable accommodation. *Cf. Ward v. Allegheny Ludlum Steel Corp.,* 397 F.Supp. 375, 377 (W.D.Pa.1975). The regulation expressly casts upon the employer the burden of proving undue hardship upon its business. Each case must stand upon its own facts. The actual cost of accommodation by filling Hardison's Sabbath shift from available personnel is not clear from the record. We do know that in this case the cost would have ended upon Wyatt's return from his vacation.[9] The company might well have concluded

---

**8.** Cases cited by TWA are readily distinguishable. They deal with situations where the work force available to accommodate the complaining employee's needs was small, *see, e. g., Johnson v. United States Postal Service,* 364 F.Supp. 37 (N.D.Fla.1973), *aff'd,* 497 F.2d 128 (5th Cir. 1974); *Drum v. Ware,* 7 FEP Cases 269, 7 EPD ¶ 9244 (W.D.N.C.1974); or where the employer presented no evidence to support its claim that it reasonably accommodated its employee's needs, *see, e. g., Riley v. Bendix Corp.,* 464 F.2d 1113 (5th Cir. 1972), or that it would suffer undue hardship, *see, e. g., Jackson v. Veri Fresh Poultry, Inc.,* 304 F.Supp.

1276 (E.D.La.1969). Moreover, we think a totality of the circumstances approach must reject unproven assumptions that the company will be inundated with similar demands. That approach would be more persuasive at a point in time when the hardship was in fact evident and was manifestly undue. Hardison's request was the first of its kind which TWA's witnesses could recall.

**9.** It should also be obvious that neither Hardison nor his religion would have benefited financially from such an accommodation.

that the additional expense was preferable to getting along with one less man on the shift or suffering the administrative inconvenience of seeking a swap for Hardison. It does not appear from the record, however, that TWA gave any serious consideration to the reasonableness of such an alternative or to the extent of the burden it might create upon the business of TWA. We cannot say that its burden of proof has been met in this case.

(3) A third alternative considered was a swap between Hardison and another employee, either for another shift or for the Sabbath days.[10] While both TWA and the union indicated no opposition to a voluntary swap, the acquiescence was clearly couched in terms of the limitations imposed by Article VI, the seniority clause of the collective bargaining agreement:

> (b) The principle of seniority shall apply in the application of this Agreement in all reductions or increases of force, preference of shift assignment, vacation period selection, in bidding for vacancies or new jobs, and in all promotions, demotions, or transfers involving classifications covered by this Agreement.

The company relied upon the union steward to handle the details. Every swap was technically at risk because the exchange was subject to the right of a senior worker to bump into the opening.

Thus, the company and the union contended that they could not individually or jointly act to make a job exchange which would accommodate Hardison's religious need to be free of servile work on his Sabbath.

The proper relationship between a bona fide seniority system and the requirement of reasonable accommodation under 29 C.F.R. § 1605.1 has not yet been settled by the Supreme Court.[11] The Equal Employment Opportunity Commission has taken the position that when the inflexibility of a collective bargaining agreement is raised as a defense to charges of religious discrimination, that inflexibility must be justified by substantial business necessity. E.E.O.C. Decision No. 73–0314 (Aug. 31, 1972), 1973 CCH EEOC Decisions ¶ 6379; E.E.O.C. Decision No. 72–2066 (June 22, 1972), 4 FEP Cases 1063, 1973 CCH EEOC Decisions ¶ 6367. At least one court has directed that an article in a collective bargaining agreement which would have required an employee to work occasional Saturdays in violation of his religious beliefs not be applied to such employee. *Drum v. Ware,* 7 FEP Cases 269, 7 EPD ¶ 9244 (W.D.N.C.1974). *But see Dawson v. Mizell,* 325 F.Supp. 511 (E.D.Va.1971). It would seem that a collective bargaining agreement, the seniority provisions of which preclude *any* reasonable accommodation for religious observances by employees, is prima facie evidence of union and employer culpability under the Act.[12] We are not required

---

10. TWA had earlier agreed to a swap on Hardison's religious holidays provided Hardison was willing to work an equal number of "Christian" holidays and another employee was willing to trade with Hardison. None of the holidays (as distinguished from Sabbath days) had fallen on Hardison's shift prior to his discharge, and we are not concerned with whether TWA's posture with respect to such religious holidays was a reasonable accommodation. We note, however, that the undertaking was to permit a swap, not to find one or obtain union approval.

11. 42 U.S.C. § 2000e–2(h) provides in part:
Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply

* * * different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system * * * provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin.
* * * * * *

12. If Saturday work inevitably falls to the employees with lowest seniority, one may well ask whether such seniority provisions would not effectively preclude TWA from ever hiring those Seventh Day Adventists, Orthodox Jews, and members of the Worldwide Church of God whose religious convictions preclude work from sundown on Friday until sundown on Saturday. It is no answer to such a person, or to the statute itself, that if he compromises his

to reach that point in this case, however, because the evidence is clear that TWA did not seek and the union therefore did not refuse to entertain a possible variance.[13]

TWA did not even seek to find volunteers within the seniority system. It left that task to the union steward, who likewise did nothing. The matter was not referred to the Union Relief Committee, an informal organization of union members through which the union and TWA were normally able to avoid confrontations over seniority variances in special situations. This was the first Sabbath request which TWA and the union had received at the Kansas City operation. While company officials testified of their concern that giving Hardison a variance would irritate other union members, we find no evidence to support such an inference, nor are we convinced that such irritation, if real, would have been an undue hardship on the employer's business. *See Cummins v. Parker Seal Co.,* 516 F.2d 544 (6th Cir. 1975). *See generally,* Annot., 22 A.L.R.Fed. 580 (1975).

### III

### UNION LIABILITY

 The District Court rejected the union's contention that the duty of accommodation falls only upon the employer and not upon the union. Judge Oliver observed:

The language of the regulation does speak in terms of the employer but so have other provisions and regulations pursuant to the Act, which have been interpreted to include the union. For example, 42 U.S.C. § 2000e–2(h), the provision on seniority systems discussed below has been applied to un-

ions. See, e. g., *Local 189, United Papermakers and Paperworkers v. United States,* 416 F.2d 980 (5th Cir. 1969).

Furthermore, this case is a perfect example of a situation in which a union could accommodate a member if required to do so. TWA agreed that plaintiff could change shifts if the union approved. Such approval would mean that the union would have to suspend the operation of the seniority rules in plaintiff's case. Had the union made this accommodation, plaintiff would have been able to observe his Sabbath as he wished.

375 F.Supp. at 882. We agree with Judge Oliver's analysis and conclusion that in a proper case union may be held to a duty of reasonable accommodation as well as the employer. This conclusion is consistent with the provisions of 42 U.S.C. § 2000e–2(c), which declare it to be an unlawful employment practice for a union "to cause or attempt to cause an employer to discriminate against an individual in violation of this section." Thus, the union may be held liable if it purposefully acts or refuses to act in a manner which prevents or obstructs a reasonable accommodation by the employer so as to cause the employer to discriminate.

The District Court next considered the union's duty in light of its existing contract. Finding the seniority provisions of the contract to be facially neutral, the District Court held it to be "coincidental" that as to Hardison "the seniority system acted to compound his problems in exercising his religion." 375 F.Supp. at 883. The District Court further found that the union's duty to accommodate in this case "did not require the union to ignore its seniority system" and that the

---

religious beliefs for a time he may develop enough seniority to practice them again.

**13.** In *Shaffield v. Northrop Worldwide Aircraft Services, Inc.,* 373 F.Supp. 937 (M.D.Ala.1974), a collective bargaining agreement which contained a seniority provision also contained a provision that "seniority cannot be the sole determining factor in making shift assignments." The court held that failure of the

employer to seek a variance to permit the employee, a Seventh Day Adventist, to transfer to a position which would avoid his working on his Sabbath was a violation of Title VII. *But see Kettell v. Johnson & Johnson,* 337 F.Supp. 892 (E.D.Ark.1972), decided prior to the 1972 Amendment to Title VII which makes clear that failure to make affirmative accommodation must be justified by the employer.

efforts of the union in behalf of Hardison did not violate its duty of fair representation. 375 F.Supp. at 883–85.

These conclusions are not directly challenged upon appeal, and the briefs and oral argument are directed to the breach of duty by TWA. We are thus not required to reach the substantive correctness of such conclusions. *Twin City Federal Savings & Loan Association v. Transamerica Insurance Co.,* 491 F.2d 1122, 1127 (8th Cir. 1974); *Mississippi River Corp. v. Federal Trade Commission,* 454 F.2d 1083, 1093 (8th Cir. 1972). We reserve for future cases the effect of a union's refusal to modify its employee seniority rights when no other accommodation can be accomplished without undue hardship to the employer's business. *See Robinson v. Lorillard Corp.,* 444 F.2d 791 (4th Cir.), *petition for cert. dismissed,* 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971).[14] At this point, no hard rules seem possible; the balancing of important competing interests must be done on a case by case basis.

## IV

### CONSTITUTIONAL CLAIM

Since we conclude that TWA violated its duty of accommodation, we must reach its constitutional claim that Title VII violates the Establishment Clause of the First Amendment by requiring an accommodation. TWA contends that the statute is not neutral as between groups of religious believers and nonbelievers. *See School District of Abington Township v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). The view that it is constitutionally impermissible for a

government to enforce accommodation of religious beliefs in a manner which results in privileges not available to a nonbeliever, or which result in inconvenience to the nonbeliever, is not without articulate support. *See* Edwards and Kaplan, *Religious Discrimination and the Role of Arbitration Under Title VII,* 69 Mich.L.Rev. 599, 628 (1971). *But see* Comment, *Religious Observance and Discrimination in Employment,* 22 Syracuse L.Rev. 1019 (1971).

The District Court, however, found this constitutional attack upon the statute and guidelines to be without merit. It first applied the three-fold test set forth in *Committee for Public Education & Religious Liberty v. Nyquist,* 413 U.S. 756, 772–73, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973): (1) the law must reflect a clearly secular purpose; (2) it must have a primary effect that neither advances nor inhibits religion; and (3) it must avoid excessive government entanglement with religion. The District Court stated:

> The duty to accommodate, as stated in 42 U.S.C. § 2000e(j), reflects the general secular legislative purpose of guaranteeing an employee that he will not be discharged from his job merely because of his religion. Consistent therewith, the regulation also imposes a duty to accommodate. The incidental effect of the regulation perhaps indirectly aids religion but its primary effect is to guarantee job security. The purpose and effect of the law as interpreted by the regulation is not primarily to aid religion but to prevent employers from devising means to discriminate which are not facially discriminatory but which do discriminate in effect and intent.

14. In *Robinson v. Lorillard Corp.,* 444 F.2d 791, 799 (4th Cir.), *petition for cert. dismissed,* 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971), the Fourth Circuit held:

> Avoidance of union pressure also fails to constitute a legitimate business purpose which can override the adverse racial impact of an otherwise unlawful employment practice. The rights assured by Title VII are not rights which can be bargained away—either

by a union, by an employer, or by both acting in concert. Title VII requires that both union and employer represent and protect the best interests of minority employees. Despite the fact that a strike over a contract provision may impose economic costs, if a discriminatory contract provision is acceded to the bargainee as well as the bargainor will be held liable. [footnote omitted]

44

Finally, the regulation does not involve excessive government entanglement with religion. The regulation simply requires the employer to make affirmative efforts to accommodate the employee's religion. No further involvement is necessary than a judgment by the E.E.O.C. or the court that no such accommodation was made. That is not the kind of entanglement contemplated in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.E.2d 745 (1971), and *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971).

375 F.Supp. at 888.

▆ The same constitutional argument was recently raised in *Cummins v. Parker Seal Co., supra,* and similarly rejected. The Sixth Circuit held that both the statute and the regulation met the three-fold test of *Nyquist.* The purpose of the statute, it observed, was "to prevent discrimination in employment." *Id.* at 552. This purpose, it noted, was upheld against constitutional challenge in *Griggs v. Duke Power Co., supra,* which dealt with racial discrimination. It found further, support in the reasoning of the Supreme Court in *Gillette v. United States,* 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971), wherein draft exemptions for conscientious objectors were upheld, not only upon pragmatic grounds but also because a valid state interest lay in the promotion of conscientious action thought to be important in a democratic society. The Sixth Circuit noted that neither the statute nor the regulation advanced religion; no financial support was mandated for religious institutions. *See Lemon v. Kurtzman,* 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971); *Walz v. Tax Commission,* 397 U.S. 664, 668, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). Finally, it noted that the mere requirement of reasonable accommodation involved far less government entanglement with religion than the Sunday closing laws sanctioned by *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). We find this reasoning persuasive, and we agree with the District Court's conclusion that the constitutional challenge must be rejected.

V

CONCLUSION

We affirm the entry of judgment in favor of defendant unions. Since we hold that TWA engaged in religious discrimination by breach of its duty to make a reasonable accommodation to the religious needs of Hardison through affirmative action, we reverse the judgment in favor of TWA and remand the case to the District Court for a determination of appropriate relief under 42 U.S.C. §§ 2000e–5(g) and 2000e–5(k).