**Fannie M. KILLEBREW, Plaintiff,**

v.

**LOCAL UNION 1683 OF the AMERICAN FEDERATION OF STATE, COUNTY, MUNICIPAL EMPLOYEES, AFL–CIO, Defendant.**

Civ. A. No. C 83–0895–L(A).

United States District Court,
W.D. Kentucky,
Louisville Division.

Oct. 20, 1986.

Richard Masters, Hollis, Searcy Amshoff, Amshoff and Searcy, Louisville, Ky., for plaintiff.

Herbert Segal, Louisville, Ky., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALLEN, Senior Judge.

This action is submitted to the Court for decision following a three-day trial. Plaintiff, a former employee of the Louisville Water Company, has requested the Court, in her suit against the Union, to award her $40,000.00 in backpay. The suit was brought under Title VII of the Civil Rights Act, particularly 42 U.S.C. § 2000e(j).

The action is also based on 42 U.S.C. § 2000e–2(c)(3). The law makes it clear that the Union may be held liable for religious discrimination if it purposely acts or refuses to act in a manner that prevents or obstructs a reasonable accommodation by the employer of the religious beliefs of the employee and causes the employer to discriminate. *See Hardison v. Trans World Airlines, Inc.*, 527 F.2d 33 (8th Cir.1975), *rev'd* on other grounds, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977).

In the fall of 1981, Plaintiff, who was a systems leader at the Water Company, came to the conclusion that a verse found in Deuteronomy mandated her not wearing masculine clothing. Plaintiff had previously worn a jump suit that she had designed. After the fall of 1981, however, plaintiff insisted on wearing a dress to the Water Company despite many objections and warnings by the Company.

On December 22, 1981, Robert Scanlan, Superintendent of all pumping for the Water Company, wrote Killebrew a letter stating that Plaintiff's act of wearing a skirt while performing her duties was not practical and was hazardous. On January 8, 1982, Scanlan wrote Plaintiff stating that it would be impractical to have different apparel for the employees at the Water Company and that he would consider a request for change of uniform for all employees.

On January 25, 1982, Plaintiff received a formal warning letter telling her to wear trousers, overalls, or a jumpsuit to work. The letter also stated that the Company would apply the second offense of the Water Company discipline policy if Plaintiff continued to wear female attire.

On March 18, 1982, at 2:30 p.m. a meeting between Scanlan, Welch, and Conway from the Company, Harper, Plaintiff's Union shop steward, and Plaintiff occurred. Plaintiff was told at this meeting that she

would be sent home each day if she did not wear her uniform and in fact she was sent home on each day from March 22 through March 26. On March 28 another meeting was held with the same five individuals and Plaintiff was advised that she would be terminated on March 28 if she did not wear the uniform. Plaintiff was also told that by not wearing her uniform she had suspended herself.

On March 29, 1982, Plaintiff was given her letter of termination for not wearing her uniform. At that time Harper told Scanlan that Plaintiff had expressed an interest in any job where she could wear ladies clothes within or out of the Union.

Shop steward James Harper on March 26, 1982, filed a request with the Company to take grievance No. 5069–82 to step 2. That grievance concerned the action of the Company in suspending the plaintiff. Subsequently an undated request was made by Harper to take the same grievance to step 3.

On May 12, 1982, Harper filed a request to take grievance No. 5072–82 to step 2. That request concerned Plaintiff's termination. On May 19, 1982, Harper filed the request to take grievance No. 5072–82 to step 3, and on July 1, 1982, Ed Martin, the president of the Local Union, filed a request to take both grievances to step 4.

The Company, through John Blackerby, sent Plaintiff a letter of termination on April 8, 1982, with an attachment showing the rules which were alleged to have been violated. On the same day, Dick Noe, vice president of the Company and director of customer and industrial relations, sent a memo to John Blackerby stating that Fannie Killebrew's termination was not final since Noe had agreed to continue to work with her and with the Union to accommodate her and stated that if an accommodation was found, Fannie would be considered to have no break in service and the termination would be changed to suspension. Noe, therefore, stated that until he closed the matter he would continue to attempt to accommodate Fannie as an employee of the Company.

On April 23, 1982, Noe sent a letter to Ed Martin regarding Fannie Killebrew. In the letter Martin was asked whether he believed that the Company had the unilateral right to accommodate Plaintiff's religious convictions by placing her into a job that she might be qualified to do. Martin was also informed that if this were done, Plaintiff would have to bump someone since there were no openings in the Company.

Noe then asked Martin to poll Union employees in various job classifications and determine who could perform the duties then performed by Plaintiff and if any employee would voluntarily swap jobs with Plaintiff. Noe explained that any swap would be based on the supposition that Plaintiff could do the job to which she was bumping.

Noe asked if the Union would allow the Company to exercise a variance of the bargaining agreement and allow the Company to force a bump, subject to the Union not filing a grievance. Noe's request in this regard was based on the hypothesis that no employee would voluntarily agree to a bump.

Noe also stated that if the Plaintiff's grievance could not be resolved and the Union did not agree to the variance, the Company had no job to offer Plaintiff.

On May 26, 1982, a Union management committee meeting was held. The meeting was attended by eight representatives from the Union, including Ed Martin, the president, and Doug Gingrich, the business agent, as well as Plaintiff. The Company had seven representatives present including Noe as chairman, and Blackerby and Scanlan.

The minutes of that meeting reflect the lengthy discussion that took place between the Union and the Company with regard to Plaintiff's grievance. Gingrich took the lead for the Union and questioned the alleged nonobservance of the Company's disciplinary policy. In reply Noe stated that there was work for her to do and that she could have worked as long as she adhered to the safety code. He stated that the

98

Company believed Plaintiff had resigned and had not been terminated.

Gingrich then addressed Rule 5.2 of the disciplinary policy and a discussion followed concerning whether a uniform would be less likely to catch in any rotating machinery than a dress or skirt. The discussion went on to concern itself with safety factors and with the customs of other water companies.

The Company took the position that Plaintiff would not be allowed to take a nonunion position as she had formerly been a nonunion member and had then taken a Union position.

After Gingrich read Noe's April 23 letter to Martin, Ulysses Green, a member of the Union, suggested that the Company reinstate the job of troubleshooter and Plaintiff discussed the fact that women are allowed to wear dresses at GE and then suggested that she could wear skirts which would fit as tightly to her body as did men's pants. Runyan, another Union member, asked if the Company had looked at other uniforms that were not loose. At the conclusion of the meeting, Noe and the Union agreed that one answer would suffice for both grievances.

On June 3, 1982, Noe denied the grievances for safety reasons. He pointed out that the Company had attempted to accommodate her but that nothing could be worked out.

A Union management committee meeting was held June 30, 1982, and was attended by Martin, Gingrich, and four others on behalf of the Union and Noe, Watkins, Scanlan, and four others on behalf of the Company. Gingrich stated that Plaintiff had one or more skirts to show management to see if they would be acceptable for her to wear. Although Watkins stated that he could not visualize any type of skirt being safe, he agreed to a meeting with the Plaintiff.

On July 12, 1982, the meeting concerning the tailored uniform designed for and worn by Plaintiff was held in Watkins's office. Plaintiff demonstrated the skirt and climbed the length of one-half a step ladder. Watkins, however, stated that the looseness of the bottom of the skirt created a safety hazard and that the uniform proposed by Killebrew must be judged unsatisfactory in view of job and personnel safety. The meeting was not attended by Union representatives but Plaintiff freely admitted that their presence would not have made a difference as the purpose of the meeting was to model the uniform and determine any hazard that might arise from the wearing thereof. Two days after the skirt demonstration, Plaintiff and the Union were advised that the Company did not consider Plaintiff's proposed uniform to be safe.

An arbitration hearing was held on November 18 and December 1, 1982. In a post-hearing brief, the Union suggested that the issue was whether the discharge of Plaintiff was for just cause. The Company, however, suggested that the issue was whether the Company had violated paragraph 2 of Rule 35 of the collective bargaining agreement by suspending and discharging Plaintiff for violating rules of the Company. In addition the arbitrator noted that the two grievances contained assertions that Plaintiff was discriminated against and terminated because of her religious beliefs and because she was female. At the hearing which was strenuously contested, five witnesses testified regarding the safety or lack of safety of the skirt which was demonstrated in July. The Company produced four experts on the subject and the Union produced Lewis Gutermuth, the safety manager for Lorilard Tobacco Company.

The arbitrator reached the conclusion that Plaintiff had previously recognized the reasonableness of working in the Company jumpsuit and that the fact that she had changed her attitude towards that requirement related to her personal life and her sincere religious beliefs which created an impasse which forced the Company to suspend and discharge her. He therefore held for the Company.

The record is convincing that the Union was vigorous in its representation of Plaintiff at the arbitration hearing. There is also abundant proof that Gingrich, the business agent for the Union, was very active in his efforts on behalf of the Plaintiff and that he attempted to solicit from Rev. Wallace Cauble the maximum support for Plaintiff's religious beliefs. In that context, it might be noted that the Rev. Cauble was rather reticent although he did write a letter dated April 6, 1982, at Gingrich's request that stated that Evangel Tabernacle, the church where Plaintiff was a member, recognized the bible teaching that women are not to wear the same clothing as men. However, investigation from Wiliam Hoge, the Union attorney, revealed that the Rev. Cauble would have testified that there were women in his congregation who were allowed to wear pantsuits and did wear them at services.

With regard to the polling of the Union membership as to whether any of them would swap jobs with Plaintiff, this poll was accomplished and the results were negative.

With regard to the request that the Union by polling to determine whether it would waive the collective bargaining agreement provision and allowing bumping by Killebrew to take place without filing a grievance, the Union did not take any formal action. It is obvious that such action would have required a real sacrifice on the part of those unfortunate members of the Union whose positions would have been downgraded because of the bumping.

█ Plaintiff contends that the Union failed to take reasonable steps to accommodate her religious beliefs. Plaintiff argues that Ed Martin, the Union president, should have swapped jobs with Plaintiff. Martin at the time of the dispute between the Company and the Plaintiff was employed in department No. 1 as a meter reader. When he was asked why he did not offer to swap jobs with Plaintiff, he replied that he was not qualified to perform her job. In order to be qualified for that job, some training would have been required prior to qualification. However, the main barrier to the swapping of jobs between Martin and Plaintiff was the Company's insistence that the job swapping be confined to four categories, none of which categories pertained to Martin's employment.

█ Plaintiff also contends that the Union discriminated against her because it entered into a collective bargaining agreement with the Company that allowed employees who were incapacitated and could no longer perform their old jobs to bid into new jobs and bump fellow employees. Plaintiff contends that a similar concession should have been made to her inasmuch as one exception to the general policy of the Union against bumping existed. The Court fails to see that the Union was obligated to carve out another exemption to the general bumping practices, there being nothing in the collective bargaining agreement that would have imposed a duty on the Company to follow such an exception. It should be added that both the Company and the Union in the collective bargaining agreement have agreed that there should be no discrimination on account of religion. We also note that the Company and the Union both acknowledged the sincerity of Plaintiff's religious beliefs and that the Company's resistance to her continued employment was due to safety factors and not to religious bias or prejudice. It is of course a matter of record that the Company later settled the action with the Plaintiff against it and paid her $40,000.00.

█ Plaintiff seems to also argue that there was a duty on the Union to pursue more aggressively the idea broached by Noe that the Union agreed to waive its right to file a grievance and allow Plaintiff to bump one of the Union members. While it is true that the Union did not aggressively pursue this proposal, two other factors are significant: one is that an individual member of the Union would have the right to file a grievance even if the Union didn't under a waiver by the Union of the seniority provision of the collective bargaining agreement. While such a grievance might not have succeeded in the long

run, it conceivably could have resulted in being taken to arbitration. The second and more significant factor is that the proposal made by the Company was unusual and one that, if accepted by the Union, probably would have resulted in considerable damage to the career hopes of those Union members whose position would have been adversely affected by the bumping process. Finally, Plaintiff complains that the Union is at fault because Charles Sattich did not swap positions with her. Sattich testified that he jokingly discussed the proposal of a swap with the Plaintiff but that nothing ever came of it, although he would have been willing to have swapped. The record does not reflect when this conversation between Sattich and Plaintiff was brought to the Union's attention. It certainly was not discussed in any of the documents presented to the Court. Sattich was a shift engineer at the Crescent plant. His duties were practically the same as the Plaintiff insofar as it pertained to their dangerous nature. His duties partially involved the occasional climbing of ladders. Scanlan, it should be noted, testified in his deposition that Plaintiff was more highly trained than Sattich and could have done Sattich's job.

Plaintiff places much reliance upon the case of *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476 (2d Cir.1985). In that case the Plaintiff was a high school teacher. The school board's collective bargaining agreement with the Union provided for three days personal business leave. That agreement was in effect from 1978 to 1982 and from 1982 to 1985. Prior contracts allowed three days for religious holidays but the more recent ones provided that the religious holidays were no longer a part of annual leave. Plaintiff wished to observe holy days that would have required him to miss approximately six school days each year.

Plaintiff was always allowed to take unpaid leave for religious holy days but repeatedly asked for two other arrangements. The first was that the board allow personal business leave to be used for religious observance. He also offered to pay the full cost of the substitute instead of being docked a larger pro rata salary deduction for observing religious holidays in excess of the three which were allowed by contract. He also agreed to supervise the substitute and make up for days missed by doing meaningful school work at other times.

The district court, after a two day trial, held that appellant had failed to prove religious discrimination. In addition the court held it had no jurisdiction over the individual board members or union officers.

The appellate court, in reversing, held that while the school board's leave policy was reasonable, the burden of proof remained on the employer to accept a reasonable proposal by the employee unless the accommodation caused undue hardship on the employer's business. *Id.* at 484.

Finally, as to the Union, the court held that the trial court should develop the facts to determine whether the union had violated a duty not to cause or attempt to cause an employer to discriminate against an individual. The court pointed to the fact that Union officials had testified that they proposed changes in the collective bargaining leave policies but that all were rejected. The court also pointed out that Plaintiff claimed that the Union never really pushed for these changes. The court also pointed to the fact that the Union joined in Plaintiff leave policy grievance but refused to enter into an EEOC conciliation agreement with Plaintiff.

*Philbrook* teaches us that we must weigh the testimony to determine whether the Union purposely acted or refused to act in a manner which prevented or obstructed a reasonable accommodation by the employer so as to cause the employer to discriminate. *See Hardison v. Trans World Airlines, Inc.*, 527 F.2d 33, at 42 (8th Cir. 1975).

■ The weight of the evidence in the instant case leads the Court to the conclusion that the Union did not purposely act or refuse to act so as to prevent or obstruct the Water Company from reaching an accommodation. We do not believe that the

Union should have varied its collective bargaining agreement with the Company to allow the Plaintiff to assert bumping privileges that ordinarily would not have been available and which would have resulted in some detriment to Union members affected by the bump. As stated by the Court in *Trans-World Airlines, Inc. v. Hardison*, 432 U.S. 63, 78–79, 97 S.Ct. 2264, 2273–2274, 53 L.Ed.2d 113 (1977), the duty to accommodate does not take precedence over seniority rights enunciated in a collective bargaining agreement. Unless the Court were to find that the failure of the Union to agree to the variation of the collective bargaining agreement was a failure to accommodate or that the refusal of Union members to swap jobs with the Plaintiff constituted a failure, the Court is impelled to the belief that the Union, by virtue of its prearbitration efforts especially those of Gingrich and by virtue of its arbitration efforts, satisfied the duties imposed on it under Title VII.

A thorough analysis of *Hardison*, re-enforces the Court's belief that Plaintiff's contentions about the refusal of the Union to agree to a variance are without merit. Hardison, a Union member, was an employee of TWA. The collective bargaining agreement between the Union and the company provided for a seniority system where the most senior employee had first choice for job and shift assignments and the most junior employees were required to work when the Union's steward was unable to find enough people willing to work at a particular time or in a particular job to fill TWA's needs.

Hardison became a member of the Worldwide Church of God. That religion observes the sabbath by not performing any work from sunset on Friday until sunset on Saturday. The religion also precludes work on certain specified religious holidays. When Hardison notified the Company of his religious beliefs, the Company agreed that a Union steward would seek a job swap for Hardison or a change of days off. It was also agreed that Hardison would have his religious holidays off whenever possible if he agreed to work traditional holidays when asked. Further, the Company also agreed to try to find Hardison another job more compatible with his religious beliefs.

When Hardison transferred from building 1 to building 2, he was second from the bottom of the building 2 seniority list. He then was asked to work on Saturdays when a fellow employee went on vacation. TWA agreed to permit the Union to seek a change of work assignments for Hardison but the Union was not willing to violate the seniority provisions set out in the collective bargaining agreement and Hardison had insufficient seniority to bid for a shift for Saturdays off.

When an accommodation was not reached, Hardison refused to report for work on Saturdays. The transfer to the twilight shift proved unavailing as that schedule required him to work past sundown on Fridays. After his hearing Hardison was discharged on grounds of insubordination for refusing to work during his designated shift.

While the Supreme Court devoted practically all of its opinion to the claim against the Company and not the claim against the Union, its language about the seniority system is applicable here. The court stated that both the Union and TWA had agreed to the seniority system and that the Union was unwilling to entertain a variance over the objections of the employees senior to Hardison, and that for TWA to have arranged unilaterally for a swap would have amounted to a breach of the collective bargaining agreement. 432 U.S. at 78–79, 97 S.Ct. at 2273–2274. The Supreme Court also referred to the district court's findings that TWA had offered to accommodate Plaintiff by agreeing to any change of shifts or change of sections that Plaintiff and the Union could work out. The Supreme Court then referred to the district court's finding that any shift or change was impossible within the seniority framework and the Union was not willing to violate the seniority provisions in order to make a shift or change. *See Hardison v. Trans World Airlines*, 375 F.Supp. 877, 889 (W.D.Mo.1974). The Supreme Court pointed out that the Company was willing,

but the Union was not, to work out a shift or job trade with another employee.

While the Supreme Court did not comment specifically on the issue of whether or not the failure of the Union employees to agree to a swap constituted a violation of the accommodation clause, the following language seems pertinent:

The repeated, unequivocal emphasis of both the language and the legislative history of Title VII is on eliminating discrimination in employment, and such discrimination is proscribed when it is directed against majorities as well as minorities. *See supra* [432 U.S.], at 71–72 [97 S.Ct. at 2270–2271]. Indeed, the foundation of Hardison's claim is that TWA and IAM engaged in religious *discrimination* in violation of 703(a)(1) when they failed to arrange for him to have Saturdays off. It would be anomalous to conclude that by "reasonable accommodation" Congress meant that an employer must deny the shift and job preference of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others, and we conclude that Title VII does not require an employer to go that far.

*Id.* at 81, 97 S.Ct. at 2275 (emphasis original).

In fairness to the Plaintiff, it should be noted that the Court of Appeals affirmed the judgment of the district court in favor of the Union on the grounds that Hardison had not directly attacked the judgment in favor of the Union. However, the Supreme Court did grant both petitions for certiorari filed by TWA and the Union. The Supreme Court clears this matter up in the following language:

Because the judgment in its favor was affirmed by the Court of Appeals, the union was a prevailing party below; and Hardison has not filed a petition for certiorari seeking to change that judgment. It may thus appear anomalous to have granted the union's petition for certiorari as well as that of TWA. But the union's view is that the judgment below against TWA seriously involves union interests, because the rationale of the Court of Appeals' opinion, as the union understands it, "necessarily and explicitly assumes that petitioner Unions are legally obligated to waive or vary provisions of their collective bargaining agreement in order to accommodate respondent Hardison's beliefs, if called upon by TWA to do so." This would appear to be the position of Hardison and the EEOC in this Court. Since we reverse the judgment against TWA, we need not pursue further the union's status in this Court.

432 U.S. at 70–71 n. 5, 97 S.Ct. at 2270 n. 5 (citations omitted).

We have therefore entered our judgment this day for the Defendant Union.

## JUDGMENT

This action having been tried by the Court without a jury, and the Court having considered the evidence and all of the papers, pleadings, documents and discovery on record, and having filed its findings of fact, conclusions of law and memorandum opinion, and being fully advised in the premises,

IT IS ORDERED that the complaint of the Plaintiff be, and it hereby is, dismissed.

This is a final and appealable judgment and there is no just cause for delay.